BIG SEVEN MUSIC CORP. and Adam VIII, Ltd., Plaintiffs,

v.

John LENNON et al., Defendants,

and

Morris Levy, Additional Defendant on Counterclaim.

No. 75 Civ. 1116.

United States District Court, S. D. New York.

Feb. 20, 1976.

Walter, Conston, Schurtman & Gumpel, New York City by William Schurtman, Alan Kanzer, Bernard Diamond, New York City, for plaintiffs.

Marshall, Bratter, Greene, Allison & Tucker, New York City by James M. Bergen, and Howard P. Roy, New York City, for defendants John Lennon and Harold Seider.

Cleary, Gottlieb, Steen & Hamilton, New York City by George J. Grumbach, Jr., James McHugh, New York City, for 'defendant Apple Records, Inc.

Hogan & Hartson, Washington, D. C. by E. Barrett Prettyman, Jr., New York City, for defendants Capitol Records and EMI.

OPINION

GRIESA, District Judge.

This is an action alleging that defendants wrongfully prevented plaintiffs

from distributing a record album. The action is brought under the anti-trust laws and common law theories. The latter theories are maintainable in the federal court under the doctrine of pendent jurisdiction.

Plaintiff Big Seven Music Corp. is engaged in music publishing and is the owner of song copyrights. Plaintiff Adam VIII, Ltd. is in the business of marketing phonograph records and tapes. Both of these companies are owned by one Morris Levy.

Defendant John Lennon is a singer, musician and composer and also a member of the former English rock music group known as "the Beatles." Defendant Apple Records, Inc. is a New York corporation, indirectly owned by all four of the Beatles—Lennon, Paul McCartney, George Harrison and Richard Starkey (known as Ringo Starr). At the relevant times Lennon was president of Apple. Defendant Harold Seider is an attorney and Lennon's business advisor. Defendant EMI Records, Limited is an English corporation in the record business. Defendant Capitol Records, Inc. is a subsidiary of EMI and is in the record business in the United States. Lennon and Apple have contractual arrangements with EMI and Capitol for the distribution of records by the Beatles and the four individuals.

## I.

Morris Levy, through his company Adam VIII, specializes in distributing phonograph records through television advertising. The records are usually compilations of song hits from earlier years, previously issued by other companies. Levy selects a group of songs, acquires the licenses and "master tapes" from the various companies and reproduces the songs on his records. Levy advertises the records on television, for mail order sales and for sales through so-called "retail fulfillment centers." Retail fulfillment centers are outlets such as Woolworth's and Montgomery Ward.

Levy distributes records not only in the United States, but also in foreign countries through certain license arrangements.

The present case arises from the claim by plaintiffs that Levy entered into an oral contract on October 8, 1974 with Lennon and Apple, under which Levy was granted the right to distribute through television advertising a record album of rock and roll songs recorded by Lennon. Plaintiffs' claim as originally pleaded was that this contract was for Levy to distribute the album on a worldwide basis, through both mail order and retail distribution sales. During the trial plaintiffs amended their claim, and now assert that the contract was limited to mail order sales in the United States. Although the case involves a number of claims and counterclaims on various theories, the basic issue is whether or not such a contract was made.

A separate trial, by the Court without a jury, has been held on this issue of the existence of the contract. This opinion constitutes the Court's findings of fact and conclusions of law on the issues which have been tried.

I hold that plaintiffs have not proved the making of the alleged contract.

## II.

The background of the present case lies in an earlier lawsuit brought by one of the plaintiffs in the present action, entitled *Big Seven Music Corp. v. MacLen Music, Inc., Northern Songs, Ltd. and Apple Records, Inc.* (S.D.N.Y. 70 Civ. 1348). The essence of this suit was that a song written by John Lennon entitled "Come Together" infringed Big Seven's copyright in a song entitled "You Can't Catch Me," written by a rock and roll singer named Chuck Berry.

This action was settled on October 12, 1973. Under the settlement Lennon agreed, among other things, to record three songs belonging to Big Seven in his next album.

At the time of the October 1973 settlement agreement, Lennon was in Los An-

geles, involved in recording sessions for an album of rock and roll hits of the 1950's. It was contemplated that the rock and roll album would contain the three Big Seven songs required by the October 1973 settlement. Lennon was working with one Phil Spector, a successful producer of rock and roll records. At some point these recording sessions terminated because of difficulties created by Spector. The tapes of those songs which had been recorded were appropriated by Spector. The result was that Lennon could make no further progress towards the completion of his rock and roll album.

It was not until July 1974 that Lennon retrieved the Spector tapes. In order to obtain these tapes, Capitol paid Spector about $90,000.

By this time Lennon was working on another album entitled "Walls and Bridges." He did not resume work on the rock and roll album. He wished to complete "Walls and Bridges" first.

The "Walls and Bridges" album was released in September 1974. It was the next album released by Lennon following the October 1973 settlement, but it did not contain the three songs belonging to Big Seven, which the "next album" was required to contain under the settlement agreement.

When Levy learned about this, he considered it a breach of the settlement agreement. Levy discussed the matter with Lennon's representative, Seider, and requested a meeting with Lennon. Such a meeting was held on the evening of October 8, 1974 at the Club Cavallero on East 58th Street in New York City. This is the occasion when plaintiffs claim the alleged oral contract, forming the basis of the present action, was made.

### III.

Before discussing the evidence regarding the Club Cavallero meeting, it should be observed that Capitol was the regular distributor in North America, and EMI was the regular distributor elsewhere, for records made by the Beatles and individual members of the group. How-

ever, plaintiffs claim that, by virtue of certain contracts entered into in 1969, Apple possessed the rights to distribute Lennon's records *by mail order* in North America. Plaintiffs further claim that this circumstance was understood by both Levy and Lennon at the October 8, 1974 meeting, and was the basis for an agreement under which Levy would distribute Lennon's forthcoming rock and roll album by mail order in the United States.

The relevant contracts with EMI and Capitol are as follows. In 1962 the Beatles made a contract with EMI giving EMI the exclusive right to distribute their records. A new exclusive distributorship agreement was made in 1967 between the Beatles and EMI. It appears that under other agreements EMI licensed United States distribution rights to EMI's subsidiary Capitol.

In 1969 the parties modified these contractual arrangements. Under an agreement dated September 1, 1969 EMI granted an exclusive license to Apple to manufacture and distribute Beatles records in North America. However, the agreement required Apple to appoint Capitol as its record distributor in the United States under a form of contract approved by EMI. Moreover, the 1969 EMI-Apple agreement provided:

"8. NEITHER party may assign this agreement or any part thereof or rights hereunder without the written consent of the other . . . ."

Under date of September 1, 1969 Apple entered into the agreement, approved by EMI, appointing Capitol to be the distributor for Apple's records in North America. However, the 1969 Apple-Capitol distribution agreement contained the following provision:

"ARTICLE III
DISTRIBUTION

1. Apple hereby grants to Capitol and Distributor and they each do hereby accept all of the rights which Apple derives under the Licensing Contract, *except* (i) the right to manufacture records in the United States, *(ii) the*

*distribution by mail direct to consumers,* and (iii) the right to manufacture and distribute one motion picture sound track album which Apple is obligated to give to United Artists under a pre-existing contractual arrangement." [Emphasis added]

Plaintiffs rely on Article III, Section 1(ii), quoted above, for their argument that Apple retained the rights for mail order distribution in North America, and had the power to grant such rights to Levy.

Defendants contend that the reservation of mail order distribution rights for Apple was more limited than the language might indicate. Defendants refer to evidence that, in the negotiations of the 1969 agreements, the discussions of mail order distribution related mainly to "record club" distribution, and had nothing to do with the type of mail order distribution carried out by Levy. I will not set forth the full intricacies of defendants' position. It is sufficient for present purposes to state that defendants raise questions of substance about the interpretation of the language in question.

Defendants argue alternatively that, even if plaintiffs are correct in their interpretation of the Apple-Capitol agreement as reserving full mail order rights to Apple, all of this is subject to an underlying restriction contained in the EMI-Apple agreement of 1969. Defendants refer to the provision, quoted earlier, which prohibits any party to that agreement from assigning that agreement or any right under it without the consent of the other party. Defendants contend that this provision prevented Apple or Lennon from granting Levy *any* distribution rights, including mail order rights, without the consent of EMI.

The interpretation of this provision in the EMI-Apple contract is also hotly contested. Plaintiffs contend that the provision refers only to assignments, whereas all that Lennon agreed to do on October 8, 1974 was to grant a license to

Levy. Again, there are substantial questions of interpretation.

The relevance of these circumstances to the present case is that, when Lennon entered the meeting of October 8, 1974, he did not do so as a free agent. Both Lennon and Apple were obligated to EMI and Capitol under a complex series of agreements. The agreements were not present for review or analysis at the October 8 meeting. No representative of EMI or Capitol was at the meeting. A crucial question in the case is whether, under these circumstances, the parties at the meeting had any intention of making a binding contract granting distribution rights, mail order or otherwise, to Levy.

IV.

Although an abundance of evidence was introduced about discussions and other events happening subsequent to the meeting of October 8, plaintiffs rely solely on this meeting as being the occasion when the alleged contract was created. The material about the subsequent events is relevant only as circumstantial evidence on the question of whether or not a contract was made on October 8. Moreover, it is conceded that neither the alleged contract nor any terms thereof were ever reduced to writing. Plaintiffs' sole reliance is upon an alleged oral agreement.

The meeting of October 8, 1974 at the Club Cavallero was attended by Levy, Lennon and Seider. It was also attended by an employee of Big Seven by the name of Phil Kahl[1]; Lennon's secretary, May Pang; and a business associate of Lennon from England, Bernard Brown.

It is agreed that the meeting started with a discussion of the problem about the October 1973 settlement and the difficulty with Spector which caused work on the rock and roll album to come to a halt. It is further agreed that the discussion turned to the possibility of Lennon completing the rock and roll album and having it marketed by Levy through television promotion. Lennon was un-

1. Kahl's legal name is Philip Kolsky, and he was sworn as a witness under that name.

questionably interested in such a possibility, because he felt that the delay in completion of the album had somehow diminished its chance of success if it were marketed through normal channels, and because he was attracted to the idea of using a different means of promotion and distribution.

The question is whether the discussions of October 8, 1974 went beyond expressions of interest and resulted in the creation of an actual contract. Plaintiffs claim that they did so, and that a contract was arrived at which superseded the October 1973 settlement.

There is a sharp dispute among the parties as to what terms would be necessary to be agreed upon in order to make a valid contract of the nature claimed by plaintiffs. However, it would appear clear that, at the very minimum, the following terms would be necessary:

1. That Lennon would grant Levy or one of his companies the right to distribute a record of Lennon's songs.

2. That Lennon would provide Levy with the songs.

3. That Levy would pay Lennon or Apple a royalty—the amount and method of calculation being specified with reasonable certainty.

### V.

It is necessary to analyze in some detail the evidence regarding the first of these items.

Prior to the trial of this action, Levy made a number of sworn assertions as to what the terms of the alleged agreement were, all to the effect that the contract of October 8, 1974 granted him worldwide rights for distribution through both mail order and retail fulfillment centers. However, after several days of trial plaintiffs indicated their recognition that no such contract was possible. Plaintiffs concede that EMI had the exclusive rights to distribute Lennon's records outside North America. Plaintiffs further concede that Capitol had the exclusive rights to distribute Lennon's records through retail channels in North America (including retail fulfillment centers), and that the only possible distribution rights reserved to Lennon or Apple were those relating to mail order distribution in North America.

Accordingly, plaintiffs amended their claim as to the terms of the alleged contract. Plaintiffs now assert that the contract of October 8, 1974 was for Levy to market Lennon's rock and roll album solely through mail order distribution in the United States.

■ The fact that Levy and plaintiffs have experienced such difficulty in formulating the terms of the contract for presentation to the court is sufficient in itself to cast doubt on whether there was ever a contract at all. Moreover, the testimony about the October 8 meeting does not show by anything approaching a preponderance of the evidence that an agreement was made for Levy to have United States mail order distribution rights for Lennon's rock and roll album.

Levy testified that at the October 8 meeting, in the course of outlining his method of television merchandising to Lennon and Seider, he described *both* mail order and retail fulfillment center sales. In fact, according to Levy's testimony he indicated at the meeting that a mail order campaign tends to be preliminary to the more important, and more lengthy, efforts to market through the retail fulfillment centers.

Levy testified that at some point in the meeting the crucial question arose as to whether Lennon *was able* to grant Levy the rights to market Lennon's rock and roll album. According to Levy, Seider stated that permissions would be needed from EMI—certainly for foreign distribution, and possibly for distribution in the United States. Levy testified that he assured Seider that permission would not be needed for television mail order distribution in the United States. Levy testified as follows regarding Seider's alleged response:

"Did Mr. Seider or Mr. Lennon respond to what you said, and if so, what did they say?

"A. Mr. Seider said he believed that was right as far as the United States was concerned, but as far as the rest of the world was concerned he felt permission was needed from EMI.

"Q. Was anything said on the subject of retail fulfillment centers, whether permission was needed?

"A. He didn't think it was. He thought it might be, but he didn't think it was needed at all.

"Q. Is that what he said?

"A. Yes, sir. He didn't think it was needed."

Kahl corroborates the essential points of Levy's testimony on this subject. Plaintiffs construe this exchange as somehow constituting an "agreement" that Capitol and EMI had no rights with respect to mail order distribution in the United States which would prevent Lennon and Apple from granting such rights to Levy.

It is of interest to note the sources, according to Levy's testimony, from which Levy felt he could advise Seider and Lennon on the question of Lennon's contractual obligations with Capitol and EMI. Levy testified that in 1973, in connection with discussions about Levy issuing an album of Beatle records, Levy had been told by Allen Klein, the then manager of the Beatles, that permission from Capitol was not needed to do a mail order campaign in the United States. The second source relied upon by Levy was a published interview with Allen Klein in the November 1971 issue of *Playboy* in which Klein was quoted as describing the 1969 contracts as follows (*Playboy* Vol. 18 No. 11, p. 98):

"We had 'em. So we worked out a new contract. We got the boys increased royalties, but more important than that, we got them total control and ownership of their product in America."

Defendants, pointing to what they consider flaws in Levy's own testimony, and relying on the opposing testimony of Lennon, Seider and Brown, deny that there was any on-the-spot determination about Lennon's ability to grant distribution rights to Levy. According to the defense witnesses, Levy was told that permission was needed from EMI before *any* rights could be granted to him. Brown testified that Levy's response was to urge Seider to fly immediately to see EMI in London, which Seider declined to do.

I find for defendants on this point. There is no substantial evidence to indicate that the parties to the October 8 meeting singled out the United States mail order rights, as distinct from all other rights, and "agreed" that Lennon had the ability to convey the former to Levy.

Moreover, aside from this question of Lennon's *ability* to grant mail order rights to Levy, there is the additional question of whether, in view of the relevant commercial considerations, Lennon *was willing* to have Levy market Lennon's rock and roll album solely on a mail order basis. It should be noted that Levy, according to his own testimony, described *both* mail order and retail fulfillment center distribution to Lennon and Seider. If the parties then agreed to forgo Levy's retail fulfillment center distribution and proceed only with mail order sales, one would expect some specific discussion to this effect. Even Levy's testimony fails to reveal anything of this kind, and I find that no such discussion occurred.

## VI.

Earlier in this opinion I noted that, in order to have a valid contract between Lennon and Levy, there would need to be an agreement that Lennon would provide songs to Levy, and an agreement as to the amount and method of calculation for the royalty which Levy would pay to Lennon or Apple.

I find, on the basis of the evidence, that there was a tentative agreement for Lennon to provide 15 or 16 rock and roll songs *in the event* that Lennon in fact made a record album for Levy. However, I find that plaintiffs have not shown that there was any agreement on

the amount or method of calculation of the royalty.

My findings thus far are sufficient to indicate that no contract was made at the October 8 meeting for Lennon and Apple to produce a record album for distribution by Levy or one of his companies. Moreover, there was no agreement to abrogate the October 1973 settlement. It is unnecessary to describe the various other subjects discussed at that meeting.

## VII.

The following are the essential facts about the events occurring after October 8, 1974.

Because of Lennon's interest in the possibility of having his rock and roll album marketed by Levy, Lennon invited Levy to hear the previously recorded Spector tapes on October 9, and accepted Levy's invitation to rehearse at Levy's farm in Ghent, New York, prior to the recording of the additional songs necessary to complete the album. The actual recording sessions for the additional songs were held October 21–25. In mid-November Lennon gave Levy tapes of the songs he intended to include in the rock and roll album. These tapes were for Levy's listening, and had not been finally edited for use in a record.

■ On a few occasions Lennon made statements to musicians and to friends of Levy that he was making an album for Levy. Plaintiff cite these as evidence of the existence of a contract. But such casual statements are inadequate to compensate for the fact that the terms of a contract had not in fact been worked out.

On November 18 or 19, there was a meeting between Levy and Seider. One Michael Graham, an attorney for Lennon, was also present. Levy urged Seid-

er to speak to EMI about the permissions. There was a discussion of what Levy's costs would be in producing and promoting the record, with an attempt to indicate what would be available for Levy's profit and Lennon's royalty. The discussion was exploratory only.

At some point Seider, acting on behalf of Lennon, commenced sporadic attempts to communicate with EMI about a possible arrangement with Levy. Seider chose to approach EMI rather than Capitol, because Seider believed that EMI might be willing to exert leverage with Capitol. No conversations of substance occurred between Seider and anyone at EMI or Capitol until early January 1975.

In late December 1974 Lennon, his 11-year old son Julian, and May Pang were Levy's guests in Palm Beach and Orlando (Disneyworld), Florida. Seider met Lennon in Florida to discuss a contract, about to be signed, providing for the final dissolution of the Beatles partnership.[2] During the Florida trip Levy again urged Seider to pursue the matter of permissions with EMI, and Seider agreed to do so.

On December 31, 1974, an attorney for Lennon sent a letter to Levy stating that Lennon was prepared to go forward with the second phase of the October 1973 settlement. The letter made no reference to any possible arrangements regarding Levy's distribution of the Lennon rock and roll album. On January 9 Levy wrote Lennon's attorney asserting the claim that the October 1973 settlement had been superseded by an agreement for Lennon to make a record which Levy would market "throughout the world by use of television advertising."

Meanwhile, Capitol became active. An executive of Capitol requested a meeting with Seider, which was held on January 9. On this occasion Seider explained to

**2.** One of the disputes among the Beatles for several years related to the question of who had the right to the earnings from recordings by individual members of the group. The agreement for the dissolution of the Beatles provided that after October 1, 1974 all recordings by individual Beatles and income arising therefrom would be treated as the property of the individual. I have considered the possibility that the October 1, 1974 date was inserted to cover a contract between Lennon and Levy on October 8, 1974. In view of all the evidence, I do not believe that such a thing has been established.

Capitol for the first time what had occurred at the meeting of October 8 and the discussions about the possibility of an arrangement between Lennon and Levy. As one might expect, Capitol was not interested in having Levy market a record album made by one of Capitol's artists. In subsequent meetings with Seider and Lennon in Los Angeles and New York, it was decided that Lennon's rock and roll album would be marketed through Capitol.

On January 29 or 30 Seider told Levy that there could be no agreement permitting Levy to distribute the album. Levy decided that he would nevertheless proceed with the album, using the tapes he had received from Lennon in November. Levy called his album "Roots" and his company Adam VIII released it in early February.

Capitol directed that its version of the album be completed on a rush schedule. Lennon made the final editing of the tapes. Capitol's album, called "John Lennon Rock 'n' Roll," was released about February 15.

At about the time Levy's album was released, Capitol dispatched telegrams to various parties involved in the production and distribution of Levy's album, asserting that EMI and Capitol had exclusive rights in the songs and threatening to take legal action. The production and distribution of Levy's album came to a halt shortly thereafter.

I conclude, on the basis of the evidence about the October 8, 1974 meeting and on the basis of all the other relevant evidence, that no contract was entered into by Lennon or Apple granting Levy or one of his companies the right to produce and distribute Lennon's rock and roll album.

In view of the above ruling, it is unnecessary to discuss the Statute of Frauds issue raised by defendants.