BIG SEVEN MUSIC CORP. and Adam VIII, Ltd., Plaintiffs-Appellants,

v.

John LENNON et al., Defendants-Appellees,

and

Morris Levy, Additional Defendant on Counterclaims-Appellant.

Nos. 624, 860, Dockets 76–7454, 76–7480.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1977.

Decided April 13, 1977.

William Schurtman, New York City (Alan Kanzer, Bernard R. Diamond, Walter, Conston, Schurtman & Gumpel, P. C., New York City, of counsel), for appellants Big Seven Music Corp. and Adam VIII, Ltd.

Melvyn Altman, New York City (Nemeroff, Jelline, Danzig, Paley, Mandel & Bloch, New York City, of counsel), for appellant Morris Levy.

James M. Bergen, New York City (Howard Roy, Abraham Y. Skoff, Marshall, Bratter, Greene, Allison & Tucker, George J. Grumbach, Jr., Cleary, Gottlieb, Steen & Hamilton, New York City, of counsel), for appellees.

Before ANDERSON, OAKES and GURFEIN, Circuit Judges.

OAKES, Circuit Judge:

Everybody's hustlin' for a buck and a dime

I'll scratch your back and you scratch mine

.    .    .    .    .

All I can tell you is it's all show biz [1]

The words of John Lennon above are an appropriate introduction to this case, which

---

1. J. Lennon, "Nobody Loves You (When You're Down and Out)" (1973), *recorded on* the album "Walls and Bridges."

involves alleged broken promises and acrimony between supposed friends in the recording industry.

Big Seven Music Corp., a music publisher owning the copyright of certain songs in the popular music field, and Adam VIII, Ltd., a record company specializing in the sale of phonograph records and tapes through television advertising, sued Lennon, the well-known singer and songwriter of popular music and former member of "The Beatles"; Apple Records, Inc., which is owned by the Beatles (including Lennon); Harold Seider, Lennon's business adviser; Capitol Records, Inc., a manufacturer and distributor in the United States of phonograph records and tapes; and EMI Records Limited (EMI), Capitol's British parent, a world-wide manufacturer and distributor of phonograph records and tapes.

The complaint alleged violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, breach of contract, conspiracy, tortious interference with a contract, intentional falsehood, unfair competition, fraud and prima facie tort. Subject matter jurisdiction over the nonfederal claims was premised on the doctrine of pendent jurisdiction. Following a nonjury trial in the United States District Court for the Southern District of New York, Thomas P. Griesa, *Judge*, all of plaintiffs' claims were dismissed. 409 F.Supp. 122 (S.D.N.Y.1976). In the first phase of this three-part appeal, plaintiffs appeal from this dismissal.

The defendants below, except for Seider, counterclaimed against Big Seven and Adam VIII and named Morris Levy, who is the president and a controlling stockholder of Big Seven and Adam VIII, as an additional defendant on their counterclaims for copyright infringement, violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), misappropriation of property rights, and, in the case of Lennon, violation of Section 51 of the New York Civil Rights Law. The court below, in an oral decision from the bench, awarded compensatory and punitive damages to all defendants except Apple, with the total amounting to $419,-800, plus interest and injunctive relief.

Adam VIII and Levy, against whom the damages were assessed, appeal therefrom in the second part of this appeal. Because of a settlement agreement reached during the pendency of this appeal, only the awards to Lennon, totaling $145,300, are at issue here.

The court below, having found against Big Seven and Adam VIII in connection with their breach of contract and related claims, permitted Big Seven to amend its complaint to assert a claim against Lennon alone for breach of an October, 1973, settlement of an earlier lawsuit relating to a Lennon song entitled "Come Together." On that amended complaint the district court, in the third phase of this case, awarded Big Seven damages of $6,795 and refused to grant specific performance of a portion of the agreement. From that award and refusal both Big Seven and Lennon appeal.

On the first and third phases of the appeal, we affirm the judgment of the court below. On the second phase, we reverse so much of the judgment as awarded to Lennon punitive damages, and we reduce the award of compensatory damages.

## I. THE ALLEGED ORAL CONTRACT

■ As developed in more detail in the district court's reported opinion, 409 F.Supp. 122, the genesis of this case was an earlier suit brought by Big Seven against Apple Records and other music companies, alleging that a Lennon-written song, "Come Together," infringed Big Seven's copyright in a song entitled "You Can't Catch Me." That action was settled on October 12, 1973, with Lennon agreeing as part of the settlement to record in his "next album" three songs on which Big Seven held copyrights. Lennon at that time was working on an album of rock and roll hits, not written by him, coming from the 1950s—a nostalgia-type album—and it was contemplated that this album would contain the three Big Seven songs required by the settlement. At some point after the settlement date, however, Lennon and the nostalgia album's producer, one Phil Spector, had "difficulties," as a result of which Spector took

possession of the tapes made for the album. 409 F.Supp. at 124. Lennon was unable to retrieve his tapes until mid-1974, by which time he had begun work on another album, entitled "Walls and Bridges," which did not contain the three songs belonging to Big Seven, as required under the settlement agreement. "Walls and Bridges" was released in September, 1974. Levy considered this release a breach by Lennon of the "Come Together" agreement and requested a meeting with Lennon, out of which the first phase of this appeal arose.

The meeting was held on October 8, 1974, at a New York City supper club. Big Seven and Adam VIII claim that an oral agreement was reached that night by which Levy was authorized to distribute Lennon's forthcoming nostalgia album by mail order, with television advertising used to solicit orders. The district court found, however, that no such oral agreement was entered into, relying in part on the fact that Lennon did not enter the October 8, 1974, meeting "as a free agent" because Lennon and Apple were obligated to EMI and Capitol under "a complex series of agreements," 409 F.Supp. at 125. The court concluded that Levy had failed to show that an agreement was made for Levy to have United States mail order distribution rights for Lennon's rock and roll album. The court did find that there was a "tentative agreement" for Lennon to provide 15 or 16 rock and roll songs "in the event" that Lennon in fact made a record album for Levy, but also found that there was a failure to reach any agreement on the amount or method of calculation of Lennon's royalty. *Id.* at 127–28.

We cannot overturn the judge's finding that no oral agreement was reached because the finding was not "clearly erroneous" in the light of the evidence. Fed.R. Civ.P. 52(a). This is true even though Lennon invited Levy to hear his previously recorded rock and roll tapes on the day after the supper club meeting, rehearsed for a recording session at Levy's farm, went through a recording session in late October, and gave Levy tapes of the songs he intended to include in the rock and roll album, in addition to making statements to musicians and friends of Levy that he was making an album for Levy, 409 F.Supp. at 128. It is true despite the fact that, in late December, 1974, Lennon was Levy's guest in Florida and despite the fact that, on January 9, 1975, Levy wrote Lennon's attorney asserting that the October, 1973, settlement had been superseded by an agreement for Lennon to make a record that Levy would market "throughout the world by use of television advertising."

All of these matters were duly considered by the district court, which found on the basis of all the evidence—primarily oral testimony, the credibility of which must be determined by the trial judge—that no contract was entered into on October 8, 1974, by Lennon or Apple granting Levy or any of his companies the right to produce or distribute Lennon's rock and roll album. As the court below noted, the fact that Levy and plaintiffs experienced difficulty in formulating the terms of the contract for presentation to the court was "sufficient in itself to cast doubt on whether there was ever a contract at all." *Id.* at 126. We need not elaborate further on the district court opinion on this phase of the case; neither its conclusions nor the findings on which they were based are reversible.

## II. DAMAGES AWARDED TO LENNON

What happened after Levy's January 9, 1975, letter is relevant to the damages aspect of the case. Lennon's agent, Seider, had been seeking to interest EMI and Capitol Records in the nostalgia album. On January 9, while Levy was writing Lennon's attorney claiming that Lennon had authorized Levy to market the nostalgia record, as to which he had the preliminary tapes, a Capitol executive met with Seider. It was only then that the latter for the first time explained to Capitol what had occurred at the meeting of October 8, including the possibility of an arrangement between Lennon and Levy. Shortly thereafter, Capitol representatives heard the tape of the album, thought it had commercial possibilities, and rejected the idea of selling

the album on television. Seider advised them that they would have to convince Lennon that the album should be released through normal channels. On January 15, 1975, Seider told Levy about his meeting with the Capitol executives and mentioned that they were preparing a marketing program to demonstrate to Lennon that the album should be marketed in the normal retail way.

On January 28, 1975, Capitol personnel convinced Lennon that the album should be sold through normal commercial channels, because selling through television was inappropriate for an artist of his stature and would antagonize record dealers. Lennon then reviewed and approved Capitol's entire merchandising plan, which had been formulated to include radio and television advertisements and interviews, T-shirts, and all the rather elaborate paraphernalia that evidently enter into the marketing of modern popular music. On January 30, Seider informed Levy that Lennon would not release the album as a television package through Levy, and Levy thereupon informed Seider that his Adam VIII concern would release the Lennon album nevertheless, using the preliminary tape that had been given him. Seider threatened Levy with an injunction, but none was ever obtained.

While Lennon was completing his final editing of the Capitol album on February 4 and 5 and Capitol thereafter was proceeding to press the album and to print its jackets, Levy pushed ahead with his marketing plans. On February 7, Levy through Adam VIII released the Lennon album, which was entitled "Roots," giving it a mail order price of $4.98 per record and $5.98 per tape. Television commercials appeared in a limited number of markets between February 8 and 16. On February 10, 1975, three days after the release of "Roots," Levy and Adam VIII received telegrams from Capitol claiming that "Roots" was unauthorized. Capitol and Lennon also contacted televi-

sion stations and Adam VIII's suppliers, who then refused to handle "Roots."[2] A total of 1,270 copies of "Roots" was sold, with gross revenues amounting to less than $7,000, not enough to cover Adam VIII's out-of-pocket pressing, printing and advertising costs.

Capitol released its album, containing edited versions of all but two of the songs in "Roots," on February 13, 1975. This date, the court below found, was several weeks earlier than would have been the case had Levy not released a competing album, and it meant Capitol had to "rush" the album's release, although this did not affect the album's jacket or the quality of the recording and production. The Capitol album, entitled "John Lennon Rock 'n' Roll," was listed at $5.98 ($6.98 for tapes); this price, the district court found, would enable Capitol's customers, primarily record retailers, to compete effectively with the Levy product, because 90% of the records sold in the United States are discounted. The Capitol album sold 342,000 copies in the United States, despite unfavorable reviews, despite the fact that the music was not "characteristic Lennon," in that it did not involve his own compositions but rather those of early rock and roll luminaries (such as Chubby Checker), and despite the fact that teenage purchasing power was at the time affected by a recession so that record sales were down generally some 15–25%.

The district court, taking into account certain other Lennon record issues and Canadian sales of the "Rock 'n' Roll" album, which were unaffected by the issuance of the Levy album, found that "Rock 'n' Roll" would have sold 100,000 more units (records or tapes) had the Levy album not been released. On 100,000 units, Lennon's average royalty evidently would have been $66,000 (66 cents per unit). The district court further found that Capitol's sales at a $5.98 suggested list price, rather than the more

---

**2.** These activities by Capitol and Lennon apparently formed the basis of Adam VIII's Sherman Act claim, which would have required a finding that these activities amounted to an illegal boycott. See *Klor's, Inc. v. Broadway-Hale Stores,* *Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Since the trial court found that the release of "Roots" was unauthorized, however, it did not have to reach the Sherman Act issues.

customary $6.98 price, were to meet competition from "Roots," and that this meant $43,700 in lost royalties to Lennon (ten cents per unit on each of the 437,000 units actually sold in the United States and abroad [3]). The total of $109,700 in lost royalties was later reduced by stipulation to $100,300, to take account of payments that would have been made to the American Federation of Musicians (AFM). The district court also awarded Lennon $35,000 in compensatory damages under New York Civil Rights Law § 51 (McKinney 1976),[4] on the basis of injury to his reputation from the poor appearance of the Adam VIII "Roots" record jacket and commercial content on the reverse side thereof, its musical and sound quality (it contained two songs that were dropped by Lennon in his Capitol release because they were of poor quality), and the overall packaging and marketing of "Roots." Finally, on the basis that the issuance of the "Roots" album by Levy was "a willful act in conscious and willful derogation of the rights of Capitol, EMI and Lennon," without basis for belief on Levy's part that he was legally authorized to issue the album, the court below awarded Lennon $10,000 in punitive damages.

### A. *Royalty Compensation*

■ In holding that 100,000 units of sales, as well as one dollar of the selling price on each unit sold, were lost as a result of the Levy album, the court below commenced with the proposition that the Lennon album preceding "Rock 'n' Roll," entitled "Walls and Bridges," had American sales of 425,000 units and the album issued after "Rock 'n' Roll," named "Shaved Fish," had sales of 408,000 units, compared to "Rock 'n' Roll" sales of 342,000. While recognizing that the "Rock 'n' Roll" album was not an album of Lennon's own music, that it received some highly unfavorable reviews, and that in fiscal 1975 Capitol sales were down 15 to 20%, the court concluded on balance that the presence of the competing "Roots" album and television advertising, which caused Capitol to alter the release date and promotion of "Rock 'n' Roll," had a substantial adverse effect upon "Rock 'n' Roll" sales. The judge looked to Canadian sales of "Rock 'n' Roll" as indicative that sales in the United States might have been over 500,000 units. He held that the low side of potential sales was the figure for "Walls and Bridges" of 425,000 and the high side was a figure of 520,000 based upon projections from the Canadian sales.

In general, damages may be recovered only if there is a necessary, immediate and direct causal connection between the wrongdoing and the damages. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *American Safety Table Co. v. Schreiber*, 415 F.2d 373, 381 (2d Cir. 1969), *cert. denied*, 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682 (1970). Here Judge Griesa found that "it would be ignoring reality to believe" that the rushed release

3. The court below did not explain why it calculated this figure based on actual American and foreign sales of "Rock 'n' Roll," rather than on the projected sales figure had "Roots" not been released, a figure that would have been 100,000 units higher. (Foreign unit sales were not affected by the release of "Roots," but apparently the $1.00-reduction in list price was uniform across American and foreign markets.) No party here challenges use of the actual sales figure, and we believe it was appropriate under the circumstances. Since the calculation of projected sales is to a certain extent speculative, it would compound speculation to award Lennon royalties for an alleged price reduction on albums that were never sold.

4. New York Civil Rights Law § 51 (McKinney 1976) provides in pertinent part:

Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion may award exemplary damages.

of "Rock 'n' Roll" caused by "Roots" did not do some damage to the sales of the former album. Recognizing as we must the substantial role of advertising in the marketing of popular music, we cannot say that this finding is clearly erroneous. However, the evidence that release of the "Roots" album injured "Rock 'n' Roll" sales in an amount as high as 100,000 units is very thin indeed. In the first place, Capitol's rush of its promotional campaign did not affect the quality of the album or the jacket. The promotional plans had already been agreed upon, and a complete marketing campaign had been approved by Lennon and Capitol executives. No changes were made in those plans, except that there was a reduction of television advertising and there were certain delivery delays on posters, T-shirts, buttons, postcards, stickers and press kits, in addition to which plans for mobiles were dropped completely and a billboard on the Sunset Strip in Los Angeles was delayed.

The reasons advanced for the cutback in television advertising were that it was uneconomical under the circumstances, that Capitol did not have enough time to plan a television campaign, and that Capitol was concerned with compounding a bad situation by having two major competing television campaigns running at the same time. But Levy and his "Roots" album were off the air within a few days after Capitol and Lennon mobilized their forces to halt the sale of "Roots." In addition, Capitol increased its radio advertising, although radio advertisements were delayed by some ten days after "Rock 'n' Roll" was released for sale. Moreover, advertisements in the "trade press" (Billboard, Cash Box and Record World) were placed in issues which went on sale on February 17, only four days after the release of "Rock 'n' Roll," although the late release resulted in two-color instead of four-color advertisements and inability to obtain preferred placement. While there was evidence from the Capitol president that a record has its largest selling period immediately upon release and that the sales soon thereafter begin to decline, in this case "Rock 'n' Roll" did quite well in its early stages, making its way into the top twenty album hits less than a month after its release and working its way up to number four or six, depending on whose charts one examines. Of course the album might have done better but for the rush caused by "Roots." Nevertheless, an approach based on lost sales caused by "Rock 'n' Roll's" rushed release plainly would not justify the district court's 100,000 figure.

Holding as we do that the estimate of lost sales by the court below is clearly erroneous, and that it may therefore be set aside by this court, Fed.R.Civ.P. 52(a), our task is the necessarily imprecise one of finding a different, more reasonable estimate. In projecting average sales on the basis of Lennon's other record albums, the court disregarded his best-selling album, "Imagine," which sold over a million and a half copies, and also his worst-selling albums, "Two Virgins," "Unfinished Music No. Two: Life with the Lions," and "Wedding Album," each of which sold from 20,000 to 50,000 copies. The court also excluded from consideration "Sometime in New York City," which sold 164,000 following its mid-1972 release, and "Mind Games," which sold 376,000 following its October 1973 release. Needless to say, appellants would have us consider these latter two albums, since averaging them with "Walls and Bridges" would result in average sales of some 321,000 units, less than the actual "Rock 'n' Roll" sales.

We believe that the district court should have taken "Mind Games" sales into account along with the sales of "Walls and Bridges" and "Shaved Fish." "Mind Games" was the album just prior to "Walls and Bridges," which in turn preceded "Rock 'n' Roll" by only a few months. Our use of "Mind Games" seems particularly justified in light of the citation by defendants to Canadian sales of "Mind Games" (and "Walls and Bridges") in their exhibit on which the district court based its "upper limit" projection of American "Rock 'n' Roll" sales. As for "Shaved Fish," while an argument could be made for excluding it based upon its "greatest hits" character (it

was a collection of Lennon's most successful compositions, which had appeared on prior albums), we believe it should be given some weight as the Lennon album immediately following "Rock 'n' Roll." Averaging "Mind Games" in with "Walls and Bridges" and "Shaved Fish" would result in likely sales of 403,000 albums for "Rock 'n' Roll," 61,000 units more than "Rock 'n' Roll's" actual sales of 342,000.

Judge Griesa used "Mind Games" and "Walls and Bridges" comparisons of American and Canadian sales to estimate average Lennon sales in Canada to be 12.5% of average United States sales. Canada's actual unit sales of "Rock 'n' Roll" through February of 1976 were 65,000. The court was initially reluctant to attribute much weight to the Canadian figures, but in its final decision it appears to have done so. The plaintiffs' attack on the use of these figures is premised in part on the fact that the defense witness who supervised preparation of the Canadian statistical analysis, a director of financial planning and analysis for Capitol for many years, admitted that he was not personally familiar with actual retail selling prices in Canada or the state of the Canadian economy and that he did not know whether the same type of advertising was done in Canada with respect to this album, whether television promotion was used, and whether Canadian tastes were the same—the album "Imagine," for example, had sold only about 8% of its total in Canada. Moreover, plaintiffs argue that they were kept from introducing contrary Canadian evidence by Judge Griesa, who they say misled them into believing that he would not rely on the defendants' statistics. We think these deficiencies do weaken the weight accorded to the Canadian evidence, but do not bar its use in determining damages. On our view of the record, we would attribute to these figures enough weight to offset any decrease below the average reached above that might have occurred

from the American recession, from the unfavorable reviews, or from the fact that the music was "uncharacteristic Lennon." In short, we hold that the lost sales were 61,000 units, which, multiplied by Lennon's average royalty of 66 cents, would reduce his damages resulting from lost sales to $40,260, less a sum equal to the fee payable to the American Federation of Musicians, discussed *infra*.

As to the reduced price at which "Rock 'n' Roll" was offered, Mr. Menon, the president of Capitol, testified in his deposition that the first consideration for pricing "Rock 'n' Roll" at $5.98 was the condition of the marketplace in the first quarter of the calendar year, especially as it seemed to affect Capitol's sales, "in addition to Capitol's beliefs about the general state of the industry sales." He further testified that an additional reason for the "Rock 'n' Roll" album's lower price was that none of the compositions were original Lennon compositions, but rather were songs that had been exposed to the public through previous performances by other artists. While Menon also thought that the unauthorized or pirated "Roots" album had a bearing on the lower sale price, the fact is that there was apparently nothing preventing Capitol from using a suggested retail price of $6.98.[5] Finally, Menon testified that there is no elasticity of demand between the $5.98 and the $6.98 price categories, so that if Capitol had charged the higher price there would have been no decrease in sales.

Judge Griesa's finding attributed the entire reduction in price to the fact that Capitol had to reduce its price to compete with "Roots." In view of the testimony of Capitol's president and other evidence, we think this finding clearly erroneous. If the judge had attributed one-third of the $1.00 price decrease to this factor, on the basis that it was one of three major considerations, as testified to by Menon, such a finding would

---

5. From the moment the "Roots" album was first released, moreover, indeed, even prior to its release, the appellees knew that "Roots" would be sold at $4.98 and that a $6.98 suggested retail price would still permit a sufficiently low wholesale price and a sufficiently discounted retail price to consumers to enable "Rock 'n' Roll" to compete commercially with "Roots."

be sustainable. While we could remand for further findings, in the interests of terminating this litigation we reduce Lennon's damages on this basis to one-third of the 10 cents per unit Judge Griesa found them to be, or 3⅓ cents per unit, on actual American and foreign sales of 437,000 units, *see* note 3 *supra*. This results in damages of $14,567 for the price reduction, less a sum equal to the fee payable to the American Federation of Musicians.

With regard to the AFM amount, because Lennon agreed to have it deducted from his royalty damages, rather than from Capitol's damages (although the record company apparently often pays the AFM fee), we follow the same course here. Calculation of the original AFM sum involved two computations, one related to the loss of 100,000 units in sales ($6,433.64) and the other related to the $1.00 price decrease ($2,968.56). *See* Exhibit C to Plaintiff's Motion to Vacate or Modify Findings and Conclusions. As to the first figure, which involves a per-unit calculation, since we hold that the relevant loss was 61,000 units, we can take 61% of $6,433.64 or $3,924.52. As to the second figure, since we are attributing just one-third of the lower price to plaintiffs' action, it seems appropriate to deduct from Lennon's royalties one-third of this part of the original AFM payment deduction, or $989.52. Hence the combined AFM payment is $4,914.04, which, when subtracted from the total of Lennon's royalty compensation, $54,827 ($40,260 for lost unit sales plus $14,567 for the price reduction per unit sold), leaves a final royalty compensation figure of $49,912.96.

### B. *Injury to Lennon's Reputation*

■ Appellants attack the award to Lennon of $35,000 additional damages for injury to his reputation in violation of his rights under New York Civil Rights Law § 51. They argue that Lennon's reputation is "virtually impervious," that "Roots" really did not harm his reputation, and that the harm is, in any event, "worth very little."

Appellants' support for this argument is based on Lennon's prior release of one album showing complete frontal and rear nude views of Lennon and his wife, Yoko Ono, and another one showing him being arrested for drugs. But it does not follow from these facts that his image and reputation were "impervious" or not harmed by "Roots." Comparison of the actual cover of the "Roots" album released by Levy with Lennon's other album covers confirms that it is, as Lennon testified, cheap-looking, if not ugly. Comparison of the music confirms the trial judge's finding that the quality of the "Roots" album was shoddy and fuzzy, with one out-of-tune track and indistinct voices in some places, all found by the trial judge and reasonably clear even to appellate ears unused to Lennon's style of music.

Awarding damages under New York Civil Rights Law § 51 and similar statutes is a difficult question at best. Objective standards for measuring injury resulting from an invasion of privacy or an appropriation of one's name, likeness, or reputation are unlikely to be available, so that a considerable degree of discretion must rest with the finder of fact. *See Manger v. Kree Institute of Electrolysis*, 233 F.2d 5, 9 n.5 (2d Cir. 1956) (Frank, J.); *Myers v. U.S. Camera Publishing Corp.*, 9 Misc.2d 765, 768, 167 N.Y.S.2d 771, 774 (N.Y. City Ct. 1957); *Fairfield v. American Photocopy Equipment Co.*, 138 Cal.App.2d 82, 86–89, 291 P.2d 194, 197–99 (1955). *See generally* Treece, *Commercial Exploitation of Names, Likenesses, and Personal Histories*, 51 Tex. L.Rev. 637 (1973). We will not interfere with the trial court's award of $35,000 for injury to Lennon's reputation.

### C. *Punitive Damages*

■ Although the basis for Judge Griesa's award of $10,000 in punitive damages to Lennon is somewhat unclear, it appears that the sum was awarded for violations related to both Lennon's royalty claims and his New York Civil Rights Law § 51 claim.[6]

---

**6.** The trial court stated:

I believe that this case is one which comes within the standard where punitive damages are appropriate. I am referring now to the common law claims and to the claim under Section 51 of the Civil Rights Law made by Lennon.

With regard to the royalty claims, the common law New York standard for an award of punitive damages is one of "moral culpability" on the defendant's part, involving "evil and reprehensible motives" or "gross" fraud. *Walker v. Sheldon,* 10 N.Y.2d 401, 404–05, 223 N.Y.S.2d 488, 490–91, 179 N.E.2d 497, 498 (1961). Nothing in the trial court's findings would support an award to Lennon under this standard. The *Walker* standard has recently been reaffirmed by the New York Court of Appeals, which noted that a statute might expand the number of instances in which punitive damages are available. *Garrity v. Lyle Stuart, Inc.,* 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 833, 353 N.E.2d 793, 795–96 (1976).

Lennon argues here that the standard for awarding punitive damages under § 51 is lower than the common law standard, relying on the statutory language allowing "the jury, in its discretion, [to] award exemplary damages" if the person being assessed "knowingly used" the other party's name or likeness in violation of New York Civil Rights Law § 50.[7] He contends that, under § 51, it need only be shown that there was a conscious violation, and that the trial judge's finding here—to the effect that Levy released the "Roots" album knowing that he lacked the legal authority to do so—was sufficient for this purpose.

No court has given § 51 the interpretation urged by Lennon. It has been noted that § 51 gives a right "in derogation of the common law" and thus must be "strictly construed." *McGraw v. Watkins,* 49 A.D.2d 958, 959, 373 N.Y.S.2d 663, 665, (1975) (per curiam); *Myers v. U.S. Camera Publishing Corp., supra,* 9 Misc.2d at 767, 167 N.Y.S.2d at 773. While the case of *Garrity v. Lyle Stuart, Inc., supra,* suggests that some modification of the punitive damages standard may be accomplished by statute, neither that case nor any other New York case has indicated that the "exemplary damages"

provision of § 51 was intended to alter the theory underlying the award of punitive damages. This theory involves punishing the defendant and setting an example for society at large, so that others are deterred from taking similar action. A "public right," not merely private compensation, must be at stake. *Garrity v. Lyle Stuart, Inc., supra,* 40 N.Y.2d at 358, 386 N.Y.S.2d at 833, 353 N.E.2d at 795; *see Walker v. Sheldon, supra,* 10 N.Y.2d at 404, 223 N.Y.S.2d at 490, 179 N.E.2d at 498. The few cases discussing the punitive damages standard under § 51 all indicate that a similar concern about punishment and deterrence underlies the statute. *Roberts v. Condé Nast Publications, Inc.,* 286 App.Div. 729, 730, 146 N.Y.S.2d 493, 495 (1955); *Rosenberg v. Lee's Carpet & Furniture Warehouse Outlet, Inc.,* 80 Misc.2d 479, 482, 363 N.Y.S.2d 231, 234 (Sup.Ct.1974); *Myers v. U.S. Camera Publishing Corp., supra,* 9 Misc.2d at 768, 167 N.Y.S.2d at 774. Moreover, in assessing punitive damages under § 51, it has been held that the finder of fact ought to consider "the circumstantial setting" or "the context of events" within which the § 51 violation occurred, including such factors as "[g]ood faith or its absence; mistake or knowing impertinence; misapprehension of evidence of approval. . ." *Roberts v. Condé Nast Publications, Inc., supra,* 286 App.Div. at 730, 146 N.Y.S.2d at 495.

There was *no* finding here of moral culpability or evil motives, nor was there any finding that the punitive damages award would punish Levy or deter others similarly situated. Indeed, given the complexity of the factual situation, it seems most unlikely that there would be others situated as was Levy here or that a clear moral lesson could be drawn from the facts of the instant case. To the contrary, there were a number of factors, not mentioned at all by the district

---

**7.** While the statute refers only to an award of exemplary damages by a "jury," it has been held that a judge acting as a finder of fact has "the same right" as would a jury to award such

damages under § 51. *Rosenberg v. Lee's Carpet & Furniture Warehouse Outlet, Inc.,* 80 Misc.2d 479, 482, 363 N.Y.S.2d 231, 234 (Sup. Ct.1974).

court, that militate against a finding of serious blameworthiness on Levy's or Adam VIII's part.

Lennon and Levy were both looking toward the latter's marketing Lennon's record, and Levy provided him hospitality, in the form of rehearsal time, trips and the like, which was gladly accepted by Lennon. Lennon willingly furnished Levy a master tape, even though it was not finally edited, and Lennon did not have the courtesy to reply through counsel or otherwise to Levy's letter of January 9, which claimed that Levy had a contract (which the court later held he did not have). While there may be no excuse for Levy's ultimately issuing the "Roots" album, we think the fault therefor—in a concededly "hustlin'" business—was by no means all his. Indeed, the trial court found that the facts of the October 8 Lennon-Levy meeting were concealed from Capitol and EMI by Lennon's agent, Seider, long after "they should have been revealed by him to these parties," and that if Seider had not so dissembled the whole matter might have been resolved simply. Judge Griesa also found that there had been some tentative agreement between Lennon and Levy.

In assessing punitive damages the judge emphasized that Levy had no right to rely on what he had been told by one Klein, a former manager of Lennon's, about a mail order exception in an Apple-Capitol contract and on an interview of Klein that appeared in *Playboy* magazine. In fact, however, the Apple-Capitol contract did contain an exception for mail order sales, so that Levy's reliance turned out to have been at least partially correct, even if simplistically misplaced. There was proof that Adam VIII and Levy sought to have Lennon edit the "Roots" album, to design its cover and to appear in its advertisements, but Lennon refused to respond to their requests. Moreover, they did not seek to defraud the public in the broad sense, since they released an album of performances recorded by Lennon, even though the album itself erroneously claims that Lennon authorized the performance.

In view of these mitigating factors, the award of punitive damages was inappropriate under any standard. We therefore reverse it.

## III. DAMAGES AWARDED TO BIG SEVEN

The final phase of this lawsuit involves the amended complaint by Big Seven, which alleged that Lennon breached the settlement agreement arising from Big Seven's suit for infringement of its copyrighted song, "You Can't Catch Me," by the Lennon song entitled "Come Together." This agreement has been called by the parties the "Come Together Settlement Agreement," although the parties have not been able to "come together" at all. The alleged breach involved the fact that the album "Walls and Bridges" did not include the three Big Seven songs Lennon had agreed to record on his "next album" after the making of the agreement. The trial court, however, properly found that in context the words "next album" actually referred to the "Rock 'n' Roll" album. It was planned at that time as Lennon's next release, and only on a nostalgia album of that type could the Big Seven songs be useful, since none of them was written by Lennon. Even in "Rock 'n' Roll," however, only two of the three Big Seven songs, "You Can't Catch Me" and "Ya Ya," appeared; Lennon had recorded the third song, "Angel Baby," but edited it out before Capitol released the album. The trial court awarded Big Seven $6,795 for lost royalties resulting from the omission of a third Big Seven song on "Rock 'n' Roll."

In appealing this award, Lennon argues that Big Seven was judicially estopped from asserting its claim by virtue of having previously contended that the Come Together Settlement Agreement was supplanted by the alleged October 8, 1974, oral contract, which the trial court held was not in fact a contract in the first phase of this case. The court below rejected Lennon's estoppel argument, reasoning that there was no detrimental reliance by Lennon on Big Seven's original position. *See Twenti-*

*eth Century-Fox Film Corp. v. National Publishers, Inc.,* 294 F.Supp. 10, 12 (S.D.N.Y.1968). We agree. Big Seven's factual contentions have been unchanged throughout this litigation, although the courts have viewed the legal consequences stemming from these facts differently from the interpretation initially given to them by Big Seven. Big Seven is not seeking to benefit twice from inconsistent legal positions. In finding against Big Seven on the question of the oral agreement, the district court in effect held that the Come Together Settlement was still in effect. On it Lennon has not performed, and he in effect concedes that, if his estoppel argument is not accepted, the award of $6,795 for lost royalties was proper.

■ Big Seven appeals from the award on the ground that it should have been given damages in addition to those for lost royalties based on "Rock 'n' Roll's" actual sales of 342,000 albums. Big Seven's principal contention is that, if Lennon had released the additional Big Seven song, it would have generated not only royalties arising from sales of that recording, but also, because of the interest created by Lennon's version, would have induced other artists to record the same song, thereby enhancing the value of the copyright. Evidently "cover records," which are such subsequently recorded versions of the same song, are a well known phenomenon in the record industry, and in some cases the cover record royalties may amount to a substantial proportion of the total royalties earned. In the case of one hit, "Close to You," by a group named The Carpenters, for example, there was evidence below that about two-thirds, of the song's royalties since the 1970 release of The Carpenters' version have come from "cover records" by other artists.

The district court found, however, that Big Seven had failed to prove the likelihood of cover records generated by a Lennon release of "Angel Baby," the Big Seven song edited out of "Rock 'n' Roll." There was no evidence as to specific characteristics of "Angel Baby" that might tend to make it a strong candidate for a cover record. The only analysis of this nature that appears in the record is to the contrary; a Lennon-called expert witness distinguished compositions like "Angel Baby," where much depends on the style of the recording artist, from ones like "Close to You," a Burt Bacharach composition that had more potential for allowing several artists to make commercially successful recordings. There was also evidence to the effect that one track on an album would be unlikely to have the cover record impact of a hit "single" like "Close to You." In short, we find nothing erroneous in the district court's conclusion that any award of damages based on cover record potential would have been entirely speculative. We therefore affirm the award of $6,795 damages to Big Seven for breach of the Come Together Settlement Agreement.

We have considered all other contentions advanced by the parties and find them to be without merit. Judgment for Lennon in the amount of $84,912.96 and for Big Seven in the amount of $6,795, in accordance with opinion; costs of the appeal to neither party.