NEWBURGER, LOEB & CO., INC. as Assignee of Claims of David Buckley and Mary Buckley, Plaintiff-Appellant-Cross-Appellee,

v.

Charles GROSS, Mabel Bleich, Gross & Co., and Jeanne Donoghue, Defendants-Appellees-Cross-Appellants,

Newburger, Loeb & Co., a New York Limited Partnership, Andrew M. Newburger, Robert L. Newburger, Richard D. Stern, Walter D. Stern, and Robert L. Stern as Executors of the Estate of Leo Stern, Robert L. Stern, Richard D. Stern, John F. Settel, Harold J. Richards, Sanford Roggenburg, Harry B. Frank and Jerome Tarnoff as Executors of the Estate of Ned D. Frank, Fred Kayne, Robert Muh, Paul Risher, Charles Sloane, Robert S. Persky, Finley, Kumble, Wagner, Heine, Underberg & Grutman, a Partnership (formerly known as Finley, Kumble, Underberg, Persky & Roth and Finley, Kumble, Heine, Underberg & Grutman) and Lawrence J. Berkowitz, Additional Defendants on Counterclaims-Appellants-Cross-Appellees.

Nos. 897–904, Dockets 76–7476, 76–7486, 76–7488, 76–7489, 76–7494, 76–7495, 76–7499 and 76–7500.

United States Court of Appeals, Second Circuit.

Argued May 11, 1977.

Decided Aug. 24, 1977.

Donald H. Shaw, New York City (Kantor, Shaw & Davidoff, P.C., New York City, on the brief), for plaintiff-appellant-cross-appellee, Newburger, Loeb & Co., Inc.

Philip Mandel, New York City (Golden, Wienshienk & Mandel, Ralph Wienshienk, Bernard Rothman, Marc Owen Mandel and Arthur Tarlow, New York City, on the brief), for defendants-appellees-cross-appellants.

Simon H. Rifkind, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Finley, Kumble, Wagner, Heine & Underberg, Mark H. Alcott, John M. Delehanty, Beryl A. Schatz and Alan M. Gelb, New York City, on the brief), for additional defendant on counterclaims-appellant-cross-appellee Finley, Kumble, Wagner, Heine, Underberg & Grutman.

Paul D. Risher, pro se.

Leon B. Borstein, New York City (Shaw & Stedina, New York City, on the brief), for additional defendant on counterclaims-appellant-cross-appellee Robert Muh.

Martin E. Silfen, Gold, Farrell & Marks, Thomas R. Farrell and Leonard M. Marks, New York City, on the brief, for additional defendant on counterclaims-appellant-cross-appellee Fred Kayne.

Osmond K. Fraenkel, New York City, for additional defendants on counterclaims-appellants-cross-appellees Newburger, Loeb & Co., Andrew M. Newburger, Robert L. Newburger, Robert L. Stern, Richard D. Stern, Walter D. Stern and Robert L. Stern, as executors under the last will and testament of Leo Stern, deceased; and Sanford Roggenburg.

Lawrence J. Berkowitz, pro se.

Elaine Platt and Leon B. Borstein, New York City, on the brief, for additional defendant on counterclaims-appellant-cross-appellee Charles Sloane.

Robert S. Persky, New York City, on the brief, for additional defendant on counterclaims-appellant-cross-appellee pro se.

Before LUMBARD and MESKILL, Circuit Judges, and JAMESON, District Judge.[*]

LUMBARD, Circuit Judge:

These appeals and cross appeals from a judgment of the Southern District, Owen, *Judge,* are the latest chapter in the financial misfortunes of New York brokerage firm of Newburger, Loeb & Co. (hereinafter the "Partnership") and its successor, Newburger, Loeb & Co., Inc. (hereinafter the "Corporation") during the years 1969–71, which resulted in the departure of the managing partner, Charles Gross, and the arrangements made by the survivors and others to reorganize and rescue the business.

We affirm so much of the judgment of the district court which:

(1) Dismissed, as lacking in merit, the Corporation's churning claim, under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), against defendants Charles Gross, Mabel Bleich, Jeanne Donoghue, and Gross & Co.

(2) Awarded judgment to the defendants on their first, second and fourth counterclaims against the Corporation, and against the Partnership, individual members of the Partnership,[1] the promoters of the Corporation,[2] and Robert S. Persky and his law firm, Finley, Kumble, Underberg, Persky & Roth (which at the time of judgment was known as Finley, Kumble, Wagner, Heine, Underberg & Grutman), who were brought in as additional defendants on the counterclaims, for conspiracy to injure the defendants with respect to their interests in the Partnership.

We hold that the district court properly exercised its ancillary jurisdiction over these counterclaims.

(3) Dismissed, as lacking in merit, defendants' ninth counterclaim under the federal antitrust laws for destruction of Gross' employment opportunity with Rafkind & Co., a New York brokerage firm.

(4) Dismissed defendants' fifth, sixth, seventh and eighth counterclaims for lack of subject matter jurisdiction.

(5) Dismissed the six counterclaims of the Corporation and the additional defendants against Gross.

We reverse those parts of the judgment which:

(1) Awarded judgment to Gross on defendants' third counterclaim for conversion of Gross' interest in warrants to buy stock of Geon Industries, Inc., and Computer Softwear Systems, Inc.

We hold that Judge Owen erroneously exercised jurisdiction over this claim after Judge Ward correctly held that it was not within the ancillary jurisdiction of the court.

(2) Awarded $50,000 punitive damages to Gross.

Finally, although we affirm the finding of liability on defendants' first, second and fourth counterclaims, we remand these counterclaims for recomputation of damages in light of our reversal of defendants'

[*] Sitting by designation.

1. Andrew M. Newburger, Robert L. Newburger, Leo Stern, Robert L. Stern, Richard D. Stern, Harold J. Richards, Sanford Roggenburg, John F. Settel, and Ned D. Frank.

2. Fred Kayne, Paul Risher, Robert Muh, Charles Sloane and Lawrence Berkowitz were alleged by the defendants and found by the court to be the promoters. The court dismissed defendants' first, second and fourth counterclaims against Berkowitz on the ground that there was not sufficient proof of his participation in the conspiracy. As the defendants have failed to provide any substantial argument why the district court's findings of fact regarding Berkowitz are erroneous, we affirm the dismissal of these claims against Berkowitz.

The case against Alex Aixala was dismissed at the close of defendants' proof and defendants have not argued that this was error.

third counterclaim and certain difficulties with the court's computation of damages.

To further discussion of the issues, we summarize the underlying facts. The partnership was an established Wall Street brokerage firm. From about May 1959 through December 31, 1968 it acted as a clearing house for the partnership of Gross & Co., which consisted in part of Charles Gross, his sister, Jeanne Donoghue, his secretary, Mabel Bleich, and Charles Jordon; thus, the Partnership executed orders for Gross & Co. and sent confirmations and statements to its customers. Among these customers were David and Mary Buckley, who had an active account with Gross & Co. in 1962–66.

In 1969 Gross & Co. liquidated and on January 1, 1969, Gross became a general partner in the Partnership with an initial investment of about $400,000. Bleich and Donoghue became limited partners, investing about $75,000 each. Gross soon thereafter became managing partner of the Partnership and invested another $400,000 in the firm. The Partnership began to experience the record-keeping problems common on Wall Street in late 1969 and early 1970 caused by the greatly increased volume of transactions in the 1960's, which have come to be known as the "back office crunch," see, e. g., *Hirsch v. du Pont*, 553 F.2d 750 (2d Cir. 1977). By the summer of 1970 the firm was experiencing serious capital problems. A number of the partners expressed dissatisfaction with Gross' management, and he stepped down as managing partner. As he was not satisfied with the proposed new management, Gross gave notice of his withdrawal from the firm on August 31, 1970, which under the terms of the partnership agreement became effective as of September 30, 1970. Gross also demanded the return of his "additional capital" (claimed to be $400,000) and fifteen per cent of his "committed capital," pursuant to the partnership agreement. The agreement provided that at least eighty-five per cent of the "partnership interest" of a withdrawn general partner remained in the firm, at the risk of the business, for twelve months from the effective date of

withdrawal. On December 31, 1970, Bleich and Donoghue submitted notices of withdrawal from the firm.

Fred Kayne became managing partner after Gross stepped down. Before joining the Partnership Kayne and Charles Sloane had been employed as registered representatives of the firm at its California office. According to Kayne and Sloane, they were induced by Gross to join the firm and became general partners in late February, 1970, each investing $50,000. In the summer of 1970, after becoming managing partner, Kayne brought in Robert Muh and Paul Risher as consultants. At about this time, the law firm of Finley, Kumble, Underberg, Persky & Roth began to handle legal matters for the Partnership, with Robert S. Persky as the partner in charge.

Defendants allege that shortly after Kayne became managing partner he began to plot with Muh, Risher, Sloane, Lawrence J. Berkowitz (house counsel to the Partnership), and Persky to transform the Partnership into a corporation and to gain control of its assets for a small investment. According to the testimony of Gross, early in September, 1970, he met with Persky and Kayne who attempted to persuade him not to withdraw from the Partnership and who told him that he would "be sorry" if he did not cooperate.

The fortunes of the Partnership continued to dwindle, however, and in November, 1970, both Kayne and Sloane withdrew. On November 17, 1970, the New York Stock Exchange notified the firm that if it was not in compliance with the "required excess capital" provision of the Exchange constitution by November 20, steps would be taken to suspend the firm. The Partnership was also directed to prepare for possible liquidation.

Under continuing pressure from the Exchange, a reorganization was proposed by Risher and Muh as an alternative to the Partnership's liquidation. The assets of the Partnership were to be transferred to a corporation; in return, the general and limited partners and the subordinated lenders

were to receive a variety of securities in accordance with their capital positions. The corporation's promoters were Berkowitz, Kayne, Muh, Risher and Sloane. See note 2, supra. In return for investments of $10,000 each, Kayne, Risher, and Muh would each receive sixteen per cent of the common stock. Kayne and Sloane were to participate in management along with Risher and Muh. An infusion of fresh capital was to come from Alex Aixala (in the form of $1,000,000 worth of Bacardi stock), an investor brought in by Persky.

After numerous negotiations, Gross, Bleich and Donoghue refused to consent to the proposed transfer of assets; apparently, Gross felt the proposed transfer was a plot by the promoters to gain control of the Partnership assets for a small investment. The Corporation and the additional defendants contend, on the other hand, that Gross had no legal right to object to the reorganization and was merely attempting to gain a special benefit for himself by demanding a cash return of part of his investment. Although it appears that the promoters did not believe that Gross' consent (as a withdrawn general partner) was necessary to the reorganization, Gross contends they wished to dissuade him from withdrawing his capital. In any event, Bleich and Donoghue would not consent to the transfer without Gross' approval, and the promoters believed that the transfer could not be legally completed under New York law without the consent of Bleich and Donoghue (who were withdrawn limited partners).

According to the defendants, numerous attempts were made to "persuade" the defendants (particularly Gross) to consent to the transfer. The principal coercive tactic was the threat to tie up the defendants in lengthy litigation, including (1) the threat to bring suit on a claim of churning the account of David and Mary Buckley, and (2) the threat to sue Gross for fraudulently inducing Kayne and Sloane to join the Partnership and for mismanaging the Partnership's assets.

David and Mary Buckley maintained an account with Gross & Co. from April, 1962, through August, 1966, which was handled by Charles Jordon. Although the account was extremely active, by August, 1966, it showed a deficit of $332,000, which was owed to the Partnership as the clearing house. Between 1966 and 1970 unsuccessful efforts were made to collect the amounts owing. The Buckleys threatened bankruptcy if the collection efforts were pressed. In 1970 the Partnership commenced an arbitration proceeding under the rules of the Exchange. The Buckleys asserted one set-off and two counterclaims against the Partnership. The first counterclaim alleged that their account had been churned by Gross & Co. during the years 1962–66, for which the Buckleys claimed $75,000 in damages. Richard Miles, director of compliance for the Partnership in 1969–70, testified that the Buckley account was referred to him in 1970 by Leo Stern, a general partner. Miles concluded that the churning claim was without merit and was asserted as a bargaining tool. Miles testified that he communicated this evaluation to Robert Stern, the general partner to whom Miles reported, who agreed with this evaluation. According to Persky's testimony, the collection file was turned over to him in November or December of 1970. On December 30, 1970, the Partnership's $332,000 claim against the Buckleys was settled; the Buckleys agreed to pay the Partnership $50,000 and assign to it the churning claim against Gross & Co. in exchange for a release.

Risher testified that after the settlement Persky called him and stated that he thought it was a "good idea" to get the assignment of the churning claim. Persky stated in his deposition that the idea of obtaining the Buckley claim originated with him, that before and after the settlement there were discussions as to how the claim might be used in negotiations with Gross, and that he believed the churning claim might bring home to Gross "the reality of the situation." Despite the fact that there is no evidence that the Buckleys ever dealt with Charles Gross personally, the complaint in this case, which was prepared by Persky, alleged that Gross was the custom-

er's man with whom the Buckleys dealt;[3] further, as the district court found, when this error was pointed out to Finley, Kumble, no attempt was made to correct it or to add Charles Jordon as a party. The amount of damages claimed by the Corporation was $250,000—more than three times the amount claimed by the Buckleys.

Gross testified that at a meeting on January 15, 1971, attended by Risher, Muh, and Persky, he was told by Persky that he should go along with the proposed transfer and convince Bleich and Donoghue to consent. Persky told Gross that there were many claims that could be used against him if they "stood in the way of the deal," including the Buckley claim and allegations of malfeasance and it was in Gross' interest "not to be tied up in litigation for a long, long time, and to be free to work in the street." Persky told Gross to take the Buckley claim "very, very seriously." Gross refused to bend. He told Persky, Risher and Muh that they could keep their claims and that he thought the fairest solution was for the Partnership to liquidate. Shortly after this meeting concluded, Gross received a call from Kayne and Sloane in California. Sloane was extremely angry and told Gross that they had heard what had happened at the meeting and that, "If you kill this deal, we are going to sue you. You will be sued for a long time. You may never get out of the courts."

Similarly, on January 23, 1971, Kayne called Gross and arranged to meet him for lunch. Gross testified that at this meeting Kayne threatened him with litigation in California if he did not consent to the transfer. The district court credited Gross' version of these meetings. In addition to finding that various threats had been made against Gross, the court found, based on the

testimony of Bleich, that Risher threatened Bleich with the Buckley claim to a point that made her cry.

On February 3, 1971, eight days prior to the date set for the proposed transfer of assets, Kayne and Sloane sued Gross in the District Court for the Central District of California, charging that Gross had fraudulently induced them to join the Partnership and had mismanaged its assets. Eventually, this suit was dismissed after a NYSE arbitration, which found in favor of Gross. The present suit was commenced by the Corporation on February 17, 1971.

Gross also claimed that an additional tactic used to coerce his consent was the destruction of a job opportunity. The Partnership articles, which were effective for a period of two years, provided that any general partner who voluntarily withdrew from the Partnership (as did Gross) could not "engage in the business of broker or dealer in securities and commodities whether for his own account or for others" until the expiration of the partnership agreement on December 31, 1971. After Gross left the Partnership, he was offered a job opportunity as a trader by Rafkind & Co. On January 19, 1971, Rafkind wrote the Partnership requesting clearance to employ Gross. Gross alleges that Berkowitz threatened Rafkind with suit, and in any case, Berkowitz sent a letter to Rafkind informing it of the Partnership covenant not to compete; the letter also indicated that the Exchange had been notified that Gross was subject to the restrictive covenant. Rafkind then dropped the job offer and so informed the Partnership. Gross claims that at a meeting on February 5, 1971, he was told by Risher that if an "accommodation" could be reached, he could have his

---

**3.** At a general meeting of the limited partners, general partners and subordinated lenders, held early in February, 1971, prior to the transfer, Persky circulated a complaint prepared for the Partnership similar to the Corporation's complaint in this case. It contained the same factual errors concerning Gross' dealings with the Buckleys. Defendants allege that the complaint was circulated to convince the limited partners and subordinated lenders that there were valid claims outstanding against Gross, Bleich and Donoghue, which could be used to prevent them from withdrawing their capital. Persky admitted at trial that the limited partners and subordinated lenders would not have allowed the transfer to take place if Gross, Bleich, and Donoghue's demands for immediate payment of their capital contributions had been met.

job with Rafkind. However, despite these and other coercive tactics alleged by the defendants, Gross, Bleich and Donoghue refused to consent to the transfer.

The closing date for the transfer of assets from the Partnership to the Corporation had been set for February 11, 1971. The Exchange had advised the Partnership that if the required improvements in its capital position were not made, the Partnership would be suspended on February 12, 1971. The record indicates that at the January 15, 1971, meeting, attended by Persky, Risher and Muh, counsel for the defendants Philip Mandel, stated that the transfer could not legally take place without the consent of Gross, Bleich and Donoghue.

A condition precedent to the Corporation's obligation to execute the transfer agreement was the issuance of a letter of opinion from counsel to the Partnership, stating that the Partnership had the authority to make the transfer. Paul Burak, whose firm, Rosenman, Colin, Kaye, Petschek, Freund & Emil, had been retained to represent the Partnership, testified that a member of his firm researched the issue and concluded in a memorandum dated January 25, 1971, that under New York Partnership Law § 98, the transfer could not take place without the consent of all of the limited partners. Section 98(1)(b) provides, *inter alia*, that without the consent of all limited partners, a general partner or all of the general partners have no authority to "[d]o any act which would make it impossible to carry on the ordinary business of the partnership." Burak conveyed his firm's position, that the transfer could not be conducted without the consent of all of the limited partners, to the Partnership; specifically, he testified that he discussed the matter with Andrew Newburger. Burak

also conferred with Persky, who unsuccessfully attempted to persuade Rosenman, Colin to give a favorable opinion.

On the day of the closing, Rosenman, Colin refused to issue the letter of opinion. However, Persky, whose firm now represented the Corporation, stated that his firm had done some research in the area and it was agreed that Persky would issue the opinion letter as special counsel to the Partnership. The letter was issued, examined by counsel for the parties, and the deal was closed.

Under the transfer agreement the Corporation agreed to assume all liability for the claims of Gross, Bleich and Donoghue arising out of the transfer. The Corporation set up a reserve fund of $300,000 for this purpose.[4] However, no payments were or have been made to Gross, Bleich or Donoghue.

On February 17, 1971, the Corporation commenced this action as an assignee of the Buckley claim. The complaint stated that the Buckleys had assigned their claims to the Partnership and that the Partnership had assigned these claims to the Corporation on February 11, 1971. Although the complaint states five "causes of action," essentially it alleges that Gross, Bleich and Gross & Co. were liable for the churning of the Buckleys' account under the federal securities law and state common law and that plaintiff was entitled to attorney's fees. In their amended answer, which was joined in by Donoghue,[5] defendants raised nine counterclaims against the Corporation, the members of the Partnership who participated in the transfer, the promoters of the Corporation, Robert S. Persky and his former law firm, Finley, Kumble.[6]

---

**4.** While the Corporation stayed solvent for over two years after the transfer, it appears the reorganization merely delayed the inevitable. In November, 1973, the Corporation filed a petition in bankruptcy under Chapter XI, where, the litigants have informed us, it remains to date.

**5.** Although Donoghue was not named as a defendant in the original complaint, she was later officially granted leave to intervene by Judge

Owen, apparently both as a defendant to the Buckley claim and as a plaintiff on the counterclaims. See *Newburger, Loeb & Co., Inc. v. Gross*, 62 F.R.D. 397 (S.D.N.Y.1974).

**6.** Finley, Kumble and Persky were not named as additional defendants in the defendants' original answer, filed on May 3, 1971. They were brought in by the amended answer, filed on February 28, 1972. Defendants explain that it was not until extensive discovery was had

The defendants' nine counterclaims allege, in relevant part, the following:

First counterclaim (and second defense): the transfer agreement (which includes the assignment of the Buckley claim to the Corporation) is ineffective because it was executed in violation of section 98 of New York Partnership Law; defendants demand the transfer be set aside and the counterclaim defendants be held liable for damages.

Second counterclaim (and fifth defense): the settlement of the Buckley claim and its subsequent assignment to the Corporation was undertaken in bad faith in violation of the Partnership's fiduciary obligations to the defendants as a means of resisting payment of the defendants' capital interests in the Partnership; further, defendants allege that the transfer of the Partnership assets was itself a breach of fiduciary obligation. Defendants demand an accounting and the imposition of a constructive trust.

Third counterclaim: the counterclaim defendants converted certain stock warrants, which were the property of Gross, when these warrants were transferred to the Corporation as part of the Partnership's assets.

Fourth counterclaim: all of the counterclaim defendants engaged in a conspiracy to force the defendants to consent to the transfer agreement, which included manipulating the assignment of the Buckley claim and threatening the defendants with litigation.

Fifth and sixth counterclaims: pursuant to the Partnership agreement, Bleich and Donoghue are entitled to the return of their capital investments.

Seventh counterclaim: pursuant to the Partnership agreement, Gross is entitled to an accounting to determine his capital interest.

Eighth counterclaim: the counterclaim defendants "maliciously" blocked Gross' employment with Rafkind & Co. by informing it that his employment would violate the Partnership agreement.

Ninth counterclaim: the destruction of the Rafkind opportunity violates the federal antitrust laws; Gross demands treble damages.[7]

Prior to trial, the Corporation and the additional defendants moved to dismiss defendants' state law counterclaims for lack of subject matter jurisdiction. The parties also made cross motions for summary judgment.

Judge Ward in his opinion of October 16, 1973, first held that the defendants' first and second state law counterclaims were so closely linked to defenses to plaintiff's churning claims "that they must be considered 'logically related to the claim the opposing party is suing on,'" quoting C. Wright, *Law of Federal Courts* 346 (2d ed. 1970), and, thus, were compulsory counterclaims within the court's ancillary jurisdiction. The court found that the fourth counterclaim asserted the same allegedly wrongful acts and should also be treated as a compulsory counterclaim. *Newburger, Loeb & Co., Inc. v. Gross*, 365 F.Supp. 1364, 1367 (S.D.N.Y.1973).[8] However, the court found that defendants' third, fifth, sixth, seventh and eighth counterclaims were not "logically related" to the Corporation's claims and thus were not compulsory counterclaims; there being no independent jurisdictional basis for these state law claims, the court held they could be maintained only as a set-off to defeat or reduce any

that they discerned Persky's role in the conspiracy.

7. Although the ninth counterclaim refers to numerous allegations as the basis for charging violation of the antitrust laws, the defendants' brief on appeal confines itself to the argument that the circumstances surrounding the alleged destruction of the Rafkind opportunity violated the antitrust laws.

8. It appears that neither the Corporation nor any of the additional defendants made an attempt to pursue an interlocutory appeal from Judge Ward's finding of jurisdiction over these counterclaims by seeking certification pursuant to 28 U.S.C. § 1292(b).

recovery on the Corporation's claims.[9] See *United States v. Heyward-Robinson Company,* 430 F.2d 1077, 1081, n. 1 (2d Cir. 1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971).

Turning to defendants' motion for summary judgment, Judge Ward found that the transfer of the Partnership assets to the Corporation without the consent of Bleich and Donoghue violated section 98(1)(b) of New York Partnership Law.[10] However, since the only interest of Gross, Bleich and Donoghue in the Partnership was the right to be paid a certain sum of money, the court found that damages were an adequate remedy and, thus, that rescission would be inappropriate. 365 F.Supp. at 1370. Determination of the amount of damages was left for trial.

Judge Ward also concluded that the Corporation's churning claim presented triable issues and that under New York law, the Partnership was not prohibited from taking the assignment of the Buckley claim "if such an assignment is taken in good faith and does not breach the fiduciary duty owed to the partners being sued. The issue is that of the good faith of the Partnership and of Persky, the attorney representing it." 365 F.Supp. at 1370. Since the issue of good faith presented a question of fact, Judge Ward denied summary judgment on this issue.

On January 16, 1974, the Corporation and the additional defendants added six counterclaims against Gross, which alleged that he had committed various acts of mismanagement as managing partner.

Trial commenced before Judge Owen on June 16, 1975, and concluded on August 1, 1975. In his July 7, 1976 opinion, Judge Owen dismissed the Corporation's first, second, fourth and fifth claims, based on the alleged churning of the Buckley account.[11] Although he noted that there were a large number of transactions in the account, he found that they were motivated by David Buckley's desire to make a fortune in the market by speculation. The court found that Buckley was an experienced investor, that the account was nondiscretionary and that Buckley had to and did authorize every transaction, and concluded that there was "no question that the churning claim has not been proved."

Turning next to defendants' counterclaims, the court held that the promoters (except Berkowitz) as officers of the Corporation, guided by Persky, and the members of the Partnership had engaged in a conspiracy "to injure Gross, Bleich and Donoghue in their interests in the Partnership." Specifically, the court found that the injury to the defendants was part of a plot instituted by Kayne, Risher, Sloane, Muh, and Persky, "to take over the new operation on a shoestring and directly enrich themselves."

Judge Owen found that "in major measure" the consent of the general partners was obtained by arranging a "forgiveness" of some $500,000 of capital arrears owed to the Partnership by various partners. Gross, who owed no capital arrears and had invested some $800,000 in the firm, specifically objected to the forgiveness in refusing to go along with the transfer.

---

**9.** Defendants' ninth counterclaim, of course, rested upon an independent jurisdictional basis. Though Judge Ward found the claim "skeletal," it was held sufficient to withstand a motion to dismiss for failure to state a claim. 365 F.Supp. at 1367–68.

**10.** As noted, supra, § 98(1)(b) provides that general partners may not, without the consent of all of the limited partners, "[d]o any act which would make it impossible to carry on the ordinary business of the partnership." Although Bleich and Donoghue had withdrawn from the Partnership on December 31, 1971, prior to the transfer, as the district court noted, under the Partnership articles they retained

their status as limited partners for six months thereafter. Accordingly, the district court found that under § 98, their consent to the February 11, 1971, transfer was required.

**11.** The Corporation's third cause of action, which alleged that the churning of the Buckley account violated section 15(c)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(c)(1), and Rule 15C–1(7) promulgated thereunder, had previously been dismissed by Judge Ward as time-barred. 365 F.Supp. at 1371–72. The Corporation has not appealed the dismissal of this claim.

The court found that another "problem" faced by the promoters was to minimize any outflow of cash to Gross, Donoghue and Bleich. It was determined that the way to deal with Gross was to threaten him with prospective or actual litigation, which would either coerce his consent or provide a basis for refusing to pay him his capital interest. Thus, Persky manipulated the Buckley settlement, Kayne and Sloane instituted a $3,000,000 fraud suit in California (the court found the damages were an *in terrorem* figure), and Ned Frank (a general partner) prepared a list of alleged instances of malfeasance by Gross, six of which were asserted as counterclaims against Gross, in this litigation. A further lever used against Gross was the denial of the Rafkind opportunity. Judge Owen found that the "direct and circumstantial proof is quite clear that all the foregoing was participated in by all [of the promoters, except Berkowitz,] acting out of the single motive to force Gross into accepting [their] dictates." Further, the court found that when the threats failed, the promoters decided to proceed with the transfer "in knowing violation of Section 98," and "based upon Persky's worthless opinion letter." The court found that Persky, Risher, Muh, Kayne and Sloane "were actively participating, knowing what each was doing and hoping to reap substantial benefits from this joint conduct."

As for the general partners, the court found that, motivated by the promise of debt forgiveness and the desire to salvage their interests in the firm, they "lent themselves to the goals of this conspiracy by affirmatively permitting the Partnership to transfer its assets to the Corporation in violation of Section 98 of the Partnership Law and in violation of their fiduciary duties to Gross, Bleich and Donoghue as other partners, and by their knowing acquiescence in the use by the [promoters] of the various baseless litigation threats against Gross." Accordingly, the court held the Corporation and the additional defendants on the counterclaims [12] jointly and severally liable on defendants' first, second, and fourth counterclaims for the "wrongful conversion" of the capital of Gross, Bleich and Donoghue. The court awarded Donoghue and Bleich each $76,868, and awarded Gross $337,921.[13]

Judge Owen also found for Gross on defendants' third counterclaim, which Judge Ward had held could be asserted only as a set-off. This claim alleged that in 1970 the Partnership had distributed to the partners as profits an interest in certain stock warrants, which the record indicates were earned by the Partnership in 1969. These warrants were never physically distributed but were held in the Partnership's name and were transferred to the Corporation as part of the Partnership's assets. The court found that Gross did own an interest in the warrants and that the Corporation, Kayne, Risher, Persky and Finley, Kumble were liable in the sum of $58,368 and $75,803 for the willful conversion of Gross' interest in the warrants.[14] Although Judge Owen noted that Judge Ward had ruled that the third counterclaim could only be asserted as a set-off, he held that this claim had been fully litigated and ordered that the pleadings be amended to conform to the proof.

Further, Judge Owen awarded Gross $50,000 in punitive damages against the Corporation, Kayne, Risher, Persky and

12. As noted, the court dismissed the counterclaims as to Berkowitz and Aixala, see text and notes at 1–2, supra, and as used here the terms "additional defendants" do not apply to them.

13. The sum of $76,868 represented the initial capital investments of Bleich and Donoghue of $75,000, plus $1,868 owing as interest as of December 31, 1970. The court found an accounting would have shown Gross' capital interest on February 11, 1971, to be $337,921.

14. The court found that Kayne, Risher and Persky had conspired to "purloin" and had accomplished the purloining of the securities by placing them in a secret vault to ensure they would be transferred to the Corporation. Since we dismiss the third counterclaim on jurisdictional grounds, we need not examine the merits of these findings.

Finley, Kumble.[15] Although he indicated that the noncompetition clause in the Partnership articles had been asserted against Gross without "economic justification," he found that the Partnership "had the legal right to assert" the clause. Judge Owen concluded that the alleged destruction of the Rafkind opportunity did not state a cause of action and dismissed the defendants' ninth (antitrust) counterclaim. Finally, as for the six counterclaims asserted against Gross, four were abandoned at trial and Judge Owen dismissed the remaining two claims on the merits.[16] Final judgment was entered on September 1, 1976.

The Corporation appeals from the dismissal of its churning claims. Defendants appeal from the dismissal of their fifth, sixth, seventh, eighth and ninth counterclaims. The Corporation and most of the additional defendants on the counterclaims appeal from the judgments entered against them on defendants' first, second, third[17] and fourth counterclaims and for punitive damages.[18]

## I. *The Churning Claim*

◼ The Corporation argues that Judge Owen's finding that the Buckley account was not churned is clearly erroneous.

"Churning" occurs when a securities dealer abuses his customer's confidence for personal gain (e.g. to create commissions) by inducing transactions in the customer's account which are disproportionate to the size and character of the account. Churning has been held to be a deceptive device within § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, for which a private cause of action for damages will lie. See, e.g., *Ruskay v. Waddell*, 552 F.2d 392, 393 n. 2 (2d Cir. 1977); *Carras v. Burns*, 516 F.2d 251, 258 (4th Cir. 1975); *Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365, 368 n. 1 (1st Cir.), cert. denied, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1206–07 (9th Cir. 1970); *Powers v. Francis I. DuPont & Company*, 344 F.Supp. 429, 431 (E.D.Pa.1972); *Moscarelli v. Stamm*, 288 F.Supp. 453, 457 (E.D.N.Y.1968); see generally Note, Churning by Securities Dealers, 80 Harv.L.Rev. 869 (1967). In order to recover, the customer must show that the dealer effectively exercised control over trading in the account and manipulated the account to his benefit. Where, as here, the account is non-discretionary (i.e., the dealer may not make trades in the account without the customer's authorization), the plain-

---

**15.** Muh and Sloane were listed among those parties held liable for conversion of the warrants and for punitive damages in the final judgment entered on September 1, 1976. However, in an order filed on November 18, 1976, Judge Owen stated that Sloane and Muh had been added to that part of the judgment dealing with damages for conversion of the warrants and punitive damages by inadvertence and ordered their names deleted therefrom. See Fed. R.App.P. 10(e).

**16.** Although at one point the Corporation suggests that the court erred in dismissing the claim that Gross engaged in "secret trading" while managing partner, it concedes that the court's decision was not "plainly erroneous"— apparently in reference to Fed.R.Civ.P. 52(a). Neither the Corporation nor any of the additional defendants have stated any basis for disturbing the dismissal of their counterclaims against Gross; accordingly, this portion of the district court's opinion is affirmed.

**17.** In the final judgment entered by Judge Owen on September 1, 1976, he found for Gross on the claim of conversion of the stock

warrants but actually dismissed the third counterclaim for lack of jurisdiction. Apparently, Judge Owen found that the claim of conversion of the warrants was included in the second counterclaim; thus, in his opinion of July 7, 1976, Judge Owen stated that this claim was "arguably pleaded" in the second counterclaim. Since we have found that the court lacked jurisdiction over the claim, it makes little difference whether it is denominated the third counterclaim or part of the second counterclaim. We have used the term "third counterclaim" for purposes of clarity.

**18.** Three of the additional defendants on the counterclaims—John F. Settel, Harold J. Richards, and the estate of Ned D. Frank—who were held jointly and severally liable to Gross, Donoghue and Bleich for their capital interests in the Partnership, have not filed notices of appeal or participated in this appeal. Accordingly, the judgment of the district court insofar as it relates to these additional defendants is not before this court, see 28 U.S.C. § 1291; Fed.R.App.P. 3, 4.

tiff must show that he relied extensively on his broker's advice and that the broker abused the plaintiff's trust. Thus, if a customer is fully able to evaluate his broker's advice and agrees with the broker's suggestions, the customer retains control of the account. See *Carras v. Burns, supra*, 516 F.2d at 258–59.

■ In essence, the Corporation contends that the Buckley account was excessively traded by Jordon in order to generate commissions and that, at least on one occasion, Jordon gave Buckley false information. The short answer to this contention, however, is that the evidence in this area was conflicting and Judge Owen's conclusion is amply supported by the record.

It is evident from David Buckley's testimony that he is an intelligent, well-educated man with a Bachelor's Degree from Cornell University, where he majored in Economics, and a post-graduate degree in International Marketing. When Buckley opened his account with Gross & Co. he was thirty-one years old and had prior experience in the market. He testified that he spent over $100 per month on investment advisory services, in addition to subscribing to various financial journals. Buckley frequently communicated with Jordon by telephone concerning his account and testified that he was "intensely interested" in the account. According to Buckley, as many as eighty or ninety per cent of the transactions in the account occurred as a result of Jordon's suggestions; however, Jordon testified that Buckley initiated at least as many transactions as he did. In any case, Buckley authorized every transaction that took place and he testified he frequently rejected Jordon's recommendations.

The Corporation contends that the turnover ratio—the ratio of the total cost of purchases to the amount invested—averaged seven times per year and that the total amount of commissions generated was approximately $75,000. While these factors may serve as useful indicators, see, e.g., *Carras v. Burns, supra*, 516 F.2d at 258, they must be examined in light of the character of the account. As Judge Owen

found, the evidence shows that Buckley was interested in speculation and a greater volume of activity will normally be expected in such an account. See, e.g., *Landry v. Hemphill, Noyes & Co., supra*, 473 F.2d at 374; Note, supra, 80 Harv.L.Rev. at 875. The expert testimony regarding the significance of this evidence was conflicting.

In sum, the determination of whether Buckley exercised control over the account involved a question of fact, which turned largely upon the court's assessment of the witnesses' credibility and its judgment regarding Buckley's ability to evaluate the advice given to him by Jordon. Such issues are particularly the province of the trier of fact and Judge Owen's conclusion was not clearly erroneous. See Fed.R.Civ.P. 52(a).

## II. *The Counterclaims*

### A. *Jurisdiction*

■ The Corporation and the additional defendants on the counterclaims contend that the court erred in finding that the defendants' first, second and fourth state law counterclaims were compulsory counterclaims within the court's ancillary jurisdiction. It is well-established that counterclaims that are "compulsory" within the meaning of Fed.R.Civ.P. 13(a) are within the district court's ancillary jurisdiction and, thus, require no independent basis of federal jurisdiction. See, e.g., *Moor v. County of Alameda*, 411 U.S. 693, 714–15, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *United States v. Heyward-Robinson Company, supra*, 430 F.2d at 1080–81; *United Artists Corp. v. Masterpiece Productions*, 221 F.2d 213, 216 (2d Cir. 1955); further, if a counterclaim is compulsory, the district court's ancillary jurisdiction extends to third parties (in this case the additional defendants) whose presence is required for adjudication of the counterclaim. See *Moor v. County of Alameda, supra*, 411 U.S. at 714–15, 93 S.Ct. 1785; *United Artists Corp. v. Masterpiece Productions, supra*, 221 F.2d at 216–17.

■ On the other hand, the district court has no jurisdiction over a permissive counterclaim, see Fed.R.Civ.P. 13(b), unless it

rests upon an independent jurisdictional ground. *United States v. Heyward-Robinson Company, supra,* 430 F.2d at 1080–81; *O'Connell v. Erie Lackawanna R.R. Co.,* 391 F.2d 156, 163 (2d Cir. 1968), vacated as moot, 395 U.S. 210, 89 S.Ct. 1767, 23 L.Ed.2d 213 (1969); *Lesnik v. Public Industrials Corporation,* 144 F.2d 968, 976 n. 10 (2d Cir. 1944). Although there has been some criticism of the requirement of an independent jurisdictional ground for permissive counterclaims, see *United States v. Heyward-Robinson Company, supra,* 430 F.2d at 1087–88 (Friendly, J., concurring); Green, Federal Jurisdiction over Counterclaims, 48 N.W.U.L.Rev. 271 (1953), the cases have uniformly adhered to this requirement. See *Sue & Sam Mfg. Co. v. B–L–S Const. Co.,* 538 F.2d 1048, 1051 (4th Cir. 1976); *Pipeliners Local Union No. 798, Tulsa, Okl. v. Ellerd,* 503 F.2d 1193, 1198 (10th Cir. 1974); 6 Wright and Miller, Federal Practice and Procedure, § 1414 (1971).[19] At their core, the compulsory counterclaim doctrine and the parallel doctrine of ancillary jurisdiction both seek to further the same policy, which is to avoid piecemeal litigation in the federal courts. See, e.g., *United States v. Heyward-Robinson Company, supra,* 430 F.2d at 1082; *Great Lakes Rubber Corporation v. Herbert Cooper Company,* 286 F.2d 631, 633–34 (3rd Cir. 1961); *United Artists Corp. v. Masterpiece Productions, supra,* 221 F.2d at 216–17. Since a compulsory counterclaim is by definition closely related to the subject matter of the opposing party's claim, common sense and judicial economy compel the conclusion that such claims should be tried together and the extension of ancillary jurisdiction to compulsory counterclaims is consistent with Article III's grant of jurisdiction over "cases" arising under the Constitution and federal laws. See *Aldinger v.*

*Howard,* 427 U.S. 1, 6–16, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); 6 Wright and Miller, supra, at § 1414.

Fed.R.Civ.P. 13(a) provides, *inter alia,* that a counterclaim is compulsory, "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." In interpreting this language we have adopted what has been termed the "logical relation" test. See 6 Wright and Miller, supra, at § 1410. Thus, in *United Artists Corp. v. Masterpiece Productions, supra,* 221 F.2d at 216, Chief Judge Clark said, "In practice this criterion has been broadly interpreted to require not an absolute identity of factual backgrounds for the two claims, but only a logical relationship between them."[20]

Applying this standard, Judge Ward found that the controversy surrounding the sale of assets to the Corporation had "become inextricably intertwined" with the Corporation's churning claims. *Newburger, Loeb & Co., Inc. v. Gross, supra,* 365 F.Supp. at 1367. He concluded that defendants' first and second counterclaims were so closely tied to its defenses to the Corporation's claims that they were "logically related" to those claims and that since the fourth counterclaim asserted the same allegedly wrongful acts, it too should be considered a compulsory counterclaim. We agree with Judge Ward's findings and note that the evidence at trial demonstrates the soundness of his ruling.

Essentially, the defendants asserted two defenses to the Corporation's churning claims. First, they contended that the February 11 transfer, which included the transfer of the Buckley claim from the Partnership to the Corporation, was ineffective because conducted in violation of New York

---

**19.** The parties are in agreement with respect to the applicability of this rule and have not asked us to examine its continuing validity. Accordingly, we refrain from undertaking such an examination.

**20.** In *United Artists* we relied on our earlier holding in *Lesnik v. Public Industrials Corporation, supra,* which relied, in turn, upon *Moore v. New York Cotton Exchange,* 270 U.S. 593, 46

S.Ct. 367, 70 L.Ed. 750 (1926). There, in interpreting the scope of Equity Rule 30, the Supreme Court stated, " 'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." Id. at 610, 46 S.Ct. at 371.

Partnership Law § 98; accordingly, they contended that the Corporation could not press the Buckley claim because it did not own it. Second, the defendants claimed that the Corporation was estopped from asserting the claim because it was brought as part of a conspiracy against them in violation of the fiduciary duties owed to them; thus, the defendants alleged, *inter alia,* that the Buckley claim was taken by the Partnership in bad faith for the sole purpose of creating a colorable claim against them, that the transfer of assets was induced by "fraudulent special consideration" as part of a plot by Kayne, Muh and Risher to gain control of the Partnership's assets, and that the transfer itself was a violation of fiduciary duty.

It is obvious that there was a substantial overlap between the defendants' defenses and their first, second, and fourth counterclaims; indeed, proof of these defenses was tantamount to establishing defendants' case on their counterclaims. To require the defendants to assert these defenses against the Corporation and then bring a separate action on their counterclaims in state court would amount to considerable duplication of judicial time and effort and could lead to mutually inconsistent results. Thus, in a similar situation this court held that where the plaintiff brought suit upon a note and the defendant counterclaimed on the ground that the suit was part of a broader conspiracy to injure its business, the counterclaims should be viewed "as arising out of the occurrence, and surely out of the transaction, by which [plaintiff] took the note upon which his complaint was based." *Lesnik v. Public Industrials Corporation, supra,* 144 F.2d at 975. Further, Judge Clark, speaking for the court, found that "proof of the conspiracy bears directly upon [plaintiff's] allegation of due and proper assignment of the note to him and should be here tried, to avoid multiplicity of suits and secure economy of judicial action." Id. at 975. See *United Artists Corp. v. Masterpiece Productions, supra,* 221 F.2d at 216. In sum, we find that defendants' first, second and fourth counterclaims arose out of the series of assignments upon which the

Corporation's claims are based and that "these pleadings disclose a sufficient logical relationship so that, in the interest of avoiding circuity and multiplicity of action, [these counterclaims] should be considered compulsory." *United Artists Corp. v. Masterpiece Productions, supra,* 221 F.2d at 216.

■ We further conclude that defendants' fifth, sixth and seventh counterclaims were correctly dismissed for lack of subject matter jurisdiction. These claims alleged that under the terms of the Partnership agreement Gross, Bleich and Donoghue were entitled to the return of their capital interests; apparently, these claims were based on the theory that the Partnership had effectively dissolved. We can find no significant relationship between these contract claims and the substance of the Corporation's claims or the assignment of the churning claim to the Corporation. In any case, the successful assertion of defendants' first, second and fourth counterclaims has effectively made moot any claim for damages on the fifth, sixth and seventh counterclaims.

■ Judge Ward's holding that the court lacked ancillary jurisdiction over defendants' eighth counterclaim (which was followed by Judge Owen), presents a somewhat closer question. This claim alleged that the Corporation and the additional defendants had "wrongfully and maliciously" brought about the destruction of Gross' opportunity for employment with Rafkind & Co. by informing it of the restrictive covenant in the Partnership agreement. Essentially, this claim presented a state law issue of whether the restrictive covenant was reasonable as to time and area and necessary to protect legitimate interests. See *Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 683, 394 N.Y.S.2d 867, 870, 363 N.E.2d 573, 576 (1977). Unlike defendants' first, second and fourth counterclaims, resolution of this issue was largely unrelated to the validity of the assignment of the Buckley claim to the Corporation; indeed, even if the restrictive covenant was exercised solely as a coercive tactic, as defendants' al-

leged, it is not clear that this would affect the validity of the covenant if it was otherwise enforceable under state law. See id. at 684, 394 N.Y.S.2d at 870, 363 N.E.2d at 576. Although the use of the restrictive covenant against Gross tended to support the defendants' claim of breach of fiduciary duty, we conclude that Gross' claim that the exercise of the clause was an independent violation of state law was not sufficiently related to the Corporation's claims to render it a compulsory counterclaim.

■ The Corporation and certain of the additional defendants argue that Judge Owen erroneously granted Gross relief on defendants' third counterclaim after Judge Ward had held that this claim was not within the ancillary jurisdiction of the court and could be asserted only as a set-off. We agree.

The third counterclaim presented the issue of whether an interest in certain stock warrants had been distributed as profits to Gross under the Partnership agreement and, thus, whether this interest was converted when the warrants were transferred to the Corporation as part of the Partnership assets. It is undisputed that the warrants were at all times held by the Partnership, in the Partnership's name, and were never physically distributed. The basic issue was simply whether the Partnership could (consistently with the Partnership agreement) and did distribute to the general partners interests in the warrants. There was simply no logical relation, either in law or in fact, between proof of this counterclaim and proof of the Corporation's churning claim; indeed, had the transfer of assets never taken place, this would not have affected the basic nature of Gross' claim for possession of the warrants. Further, we fail to see how Judge Owen's amendment of the pleadings to conform to the proof could overcome this basic jurisdictional defect. See Fed.R.Civ.P. 82. Accordingly, we reverse the judgment insofar

as it grants relief on defendants' third counterclaim.[21]

■ Finally, defendants claim that irrespective of the doctrine of ancillary jurisdiction, all of their counterclaims were properly before the court because their first eight counterclaims were pendent to their ninth counterclaim, which rests upon the federal antitrust laws. With the exception of defendants' eighth counterclaim, discussed infra, we think defendants' reliance on the doctrine of pendent jurisdiction is without merit. The test for the presence of pendent jurisdiction was formulated by the Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) as follows:

> The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

Id. at 725, 86 S.Ct. at 1138 (footnote omitted).

The operative facts of the antitrust claim were simply whether the enforcement of the restrictive covenant violated the federal antitrust laws. In contrast, defendants' first through seventh counterclaims involved issues of state partnership and tort law, and interpretation of the partnership agreement and the distribution of profits under it, all of which were dependent upon proof of facts that were entirely irrelevant to the antitrust claim. Such claims would not ordinarily be tried together and the only common link between these claims— the allegation that enforcement of the restrictive covenant was part of a larger conspiracy involving the transfer agreement— simply does not provide the "common nucleus of operative fact" essential to the exercise of pendent jurisdiction.

21. We note that under the tolling provisions applicable to the state statute of limitations, it would appear that defendants are free to bring a separate action on their third and eighth counterclaims in state court, without fear of the limitations period having run during the pendency of this suit. See CPLR § 205.

### B. Defendants' First, Second and Fourth Counterclaims

*Liability.* The Corporation and the additional defendants raise numerous claims of error regarding Judge Owen's finding that they were each liable on defendants' first, second and fourth counterclaims for conspiring "to injure Gross, Bleich and Donoghue in their interests in the Partnership," which may be summarized as follows: first, the Corporation and the additional defendants claim that under New York law there is no tort of "conspiracy" and it was incumbent upon defendants to prove that each individual sought to be held liable knowingly participated in some actionable wrong; second, they claim that no actionable wrong was suffered by Gross, Bleich or Donoghue; and, third, that if any such wrong was committed, they did not knowingly participate in it.

At the outset, the significance of an allegation of conspiracy under New York law is to charge that an actionable wrong was committed jointly by the defendants so that the acts of one may be imputed to the others because of their common purpose and intent. See *Original Ballet Russe v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir. 1943); *A. S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 379, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957); *Green v. Davies,* 182 N.Y. 499, 504, 75 N.E. 536 (1905); *Dalury v. Rezinas,* 183 App.Div. 456, 459–60, 170 N.Y.S. 1045 (1st Dept. 1918), aff'd, 229 N.Y. 513, 129 N.E. 896 (1920). "The allegation of conspiracy carries no greater burden, but also no less, than to assert adequately common action for a common purpose by common agreement or understanding among a group, from which common responsibility derives." *Goldstein v. Siegel,* 19 A.D.2d 489, 493, 244 N.Y.S.2d 378, 382 (1st Dept. 1963) (Breitel, J.).

Judge Owen found that Kayne, Risher, Sloane and Muh, guided by Persky, had engaged in a plot to gain control of the assets of the Partnership in the course of which they participated in at least two separate wrongs to the defendants: (1) the "knowing" violation of Donoghue and Bleich's rights as limited partners under section 98, which he found to be a conversion of their capital interests in the Partnership; and (2) the violation by the members of the Partnership of the fiduciary obligations owed to Gross, Bleich and Donoghue. Thus, Judge Owen found that the partners had lent themselves to the goals of the promoters' plan by "affirmatively permitting" the transfer to take place in violation of section 98, and by their "knowing acquiescence" in the promoters' use of "various baseless litigation threats." We hold that these findings are supported by the record and are sufficient in law to impose liability upon the Corporation and the additional defendants, both on a conspiracy theory and on the related principle that one who knowingly participates with a fiduciary in a breach of trust is liable to the beneficiary for any damage caused thereby. See *Wechsler v. Bowman,* 285 N.Y. 284, 291, 34 N.E.2d 322, modified, 286 N.Y. 582, 35 N.E.2d 930 (1941); 5 Scott on Trusts, § 506 (3rd Ed. 1967).

Turning first to the claims of Donoghue and Bleich, we agree with Judges Ward and Owen that the transfer of the Partnership assets without the consent of Donoghue and Bleich was a violation of section 98 of New York Partnership Law. See, e. g., *Executive Hotel Associates v. Elm Hotel Corporation,* 41 Misc.2d 354, 245 N.Y.S.2d 929 (Civ.Ct. City of New York), aff'd, 43 Misc.2d 153, 250 N.Y.S.2d 351 (App.Term, 1st Dept. 1964). The February 11 transfer effectively terminated the Partnership and funneled its assets into a new entity. It is difficult to conceive of an act that would make it more "impossible to carry on the ordinary business of the partnership." Partnership Law, § 98(1)(b). Relying on *Mist Properties, Inc. v. Fitzsimmons Realty Co.,* 228 N.Y.S.2d 406 (Sup.Ct. Kings County 1962), Persky argues that the transfer did not violate section 98 because the partnership agreement provided that the general partners could terminate the partnership prior to its natural expiration date and delegated to the general partners the authority to manage the business. We disagree.

*Mist Properties* held that a transfer of the partnership property by general partners, without the consent of the limited partners, did not violate section 98(1)(b) where the partnership agreement "specifically contemplated and provided for" the transfer that took place. Id. at 410. Judge Ward rejected the argument that the rights of limited partners under section 98(1)(b) could be abrogated by the partnership agreement on the grounds that "[t]his section, by its terms, is absolute and not subject to variation by agreement of the parties." *Newburger, Loeb & Co., Inc. v. Gross, supra,* 365 F.Supp. at 1369. However, there is simply no language in the Partnership agreement that can be construed as granting the general partners the right to conduct the February 11 transfer; indeed, this is the precise conclusion reached by the Rosenman, Colin memorandum of January 25, 1971 discussed supra. The February 11 transfer did not merely terminate the Partnership (which, in fact, is what Gross, Bleich and Donoghue sought by liquidation), it transferred all of the Partnership assets, including the capital interests of Bleich and Donoghue, to an entirely new entity, with new management and different rights between the parties. This drastic change in the rights and relations of the parties went far beyond any powers granted the general partners to terminate or manage the business. Bleich and Donoghue were under no obligation to consent to the transfer and were entitled to insist that the Partnership be dissolved. See Partnership Law, § 99(1)(c).

We also reject Persky's claim that the transfer was "necessary" to enable the Partnership to carry on its business and that section 98(1)(b) does not apply to partnerships in "financial distress." We think Judge Ward correctly dismissed these arguments as plainly contrary to the language and intent of the statute. See *Newburger, Loeb & Co., Inc. v. Gross, supra,* 365 F.Supp. at 1369–70.

 Judge Owen found that the promoters, guided by Persky, caused the transfer to take place "in knowing violation of Section 98" and that the partners participated in the transfer and permitted it to go forward "in knowing contravention" of section 98. Since the transfer of assets was in violation of section 98, the unauthorized exercise of dominion over the capital interests of Bleich and Donoghue by the Corporation amounted to conversion.[22] See *McCoy v. American Express Co.,* 253 N.Y. 477, 482, 171 N.E. 749 (1930); *Suzuki v. Small,* 214 App.Div. 541, 556, 212 N.Y.S. 589 (1st Dept. 1925), aff'd, 243 N.Y. 590, 154 N.E. 618 (1926). Further, by causing the transfer to take place in knowing violation of section 98, the partners wrongfully appropriated the capital interests of Bleich and Donoghue and were liable to them in an action for an accounting.[23] See, e.g.,

---

**22.** As noted, the effect of the transfer was to terminate the Partnership and convey its assets to a new entity. Although as a general proposition limited partners have no property right in the partnership assets, see, e.g., *Alley v. Clark,* 71 F.Supp. 521, 526–28 (E.D.N.Y.1947), Bleich and Donoghue had a capital investment in the Partnership and upon its termination had the right to demand their appropriate share of the assets. Thus, we conclude that at the time of the transfer Bleich and Donoghue had a *possessory interest in specific money, which* was wrongfully converted.

**23.** Although Judge Owen's finding of conversion against the non-partner additional defendants was proper, see *Mannaberg v. Herbst,* 45 N.Y.S.2d 197, 201 (Sup.Ct. N.Y. County 1943), aff'd, 267 App.Div. 818, 47 N.Y.S.2d 100 (1st Dept.), aff'd, 293 N.Y. 657, 56 N.E.2d 255 (1944), it is unclear whether the partners could

be sued in an action at law for conversion. As a general rule, in a going partnership a partner may not sue another partner at law for conversion of or injury to partnership property and is limited to an action in equity for an accounting. See *Bassett v. American Meter Co.,* 20 A.D.2d 956, 957, 249 N.Y.S.2d 815 (4th Dept. 1964); *Dalury v. Rezinas, supra,* 183 App.Div. at 460, 170 N.Y.S. 1045. This rule is based upon the convenience of the parties, the fact that equitable relief may be necessary to protect the rights of the parties, and the notion that only after a balance has been struck can the relative rights of the parties be definitively established. See, e.g., *Bassett v. American Meter Co., supra;* Crane and Bromberg, *Law of Partnership,* § 69 (1968). However, where the partnership has terminated and the plaintiff seeks to recover for a wrong to his individual interest, as here, the rule against actions at law has not always applied. See *Mannaberg v. Herbst, supra,* 45

*Bassett v. American Meter Co.,* 20 A.D.2d 956, 957, 249 N.Y.S.2d 815 (4th Dept. 1964); *Sohon v. Rubin,* 282 App.Div. 691, 122 N.Y. S.2d 439 (1st Dept. 1953); *Hasday v. Barocas,* 10 Misc.2d 22, 25–26, 115 N.Y.S.2d 209 (Sup.Ct. N.Y. County 1952). The promoters (who also acted as officers of the Corporation) and Persky were properly held liable for causing the wrongful appropriation of the capital interests of Bleich and Donoghue, see, e.g., *Mannaberg v. Herbst,* 45 N.Y.S.2d 197, 201 (Sup.Ct. N.Y. County 1943), aff'd, 267 App.Div. 818, 47 N.Y.S.2d 100 (1st Dept.), aff'd, 293 N.Y. 657, 56 N.E.2d 255 (1944), and for participating in the partners' breach of trust. See *Wechsler v. Bowman, supra,* 285 N.Y. at 291, 34 N.E.2d 322; *Mannaberg v. Herbst, supra,* 45 N.Y.S.2d at 201.

The partners, promoters and Persky argue that they cannot be held liable to Bleich and Donoghue if they believed in good faith that the transfer was not in violation of their rights. Assuming this to be so, we find there was ample evidence to support Judge Owen's finding that they caused the transfer to go forward in knowing violation of the rights of Donoghue and Bleich.

Turning first to the promoters and Persky, the record indicates that at least by January 15, 1971, Persky, Risher, and Muh had been informed by counsel to Donoghue

and Bleich that it was their position that the transfer could not be legally accomplished without their consent. By January 25, 1971, the Rosenman, Colin firm, acting as counsel to the Partnership, had prepared a memorandum concluding that under section 98(1)(b) the transfer could not go forward without the consent of all of the limited partners; their memorandum specifically rejected Persky's main argument on appeal—that the consent of Bleich and Donoghue was not necessary under *Mist Properties.* Burak testified that around the time the memorandum was prepared he told Persky that his firm had concluded that the consent of all of the limited partners was necessary and gave Persky either a copy of the memorandum or the relevant citations. It is uncontroverted that in a letter to all counsel, dated February 2, 1971, Persky stated that he had been advised that Bleich would not consent to the transfer and that "[u]nless we are advised in writing that Miss Bleich will consent . . . our plans to close on February 11, 1971 will be cancelled and . . . [the Partnership] will be liquidated."

Burak testified that on February 10, 1971, Persky unsuccessfully attempted to persuade the Rosenman, Colin attorneys to issue a favorable opinion. Judge Owen found that at the February 11 closing Persky "professed astonishment" when the Rosenman, Colin attorneys announced that

N.Y.S.2d at 199; Crane and Bromberg, supra, § 69.

However, even assuming that Gross, Bleich and Donoghue could not bring an action at law against the partners, we do not think that because Judge Owen stated that the partners were guilty of "converting" the Partnership interests of the defendants, his finding of liability on defendants' first, second and fourth counterclaims must be reversed.

The first and second counterclaims alleged that the Corporation and the additional defendants were required to account for the capital interests of the defendants and should be held as constructive trustees. The ground upon which an accounting was sought was breach of fiduciary duty and Judge Owen specifically found that the partners had breached their fiduciary obligations by permitting the transfer to go through in violation of section 98 and by furthering the goals of the conspiracy initiated by the promoters. This inquiry was the proper

subject of the accounting requested by the defendants. See *Bassett v. American Meter Co., supra,* 20 A.D.2d at 957, 249 N.Y.S.2d 815; Crane and Bromberg, supra, § 72 at 411. We find that Judge Owen correctly concluded that the transfer and the events leading up to it constituted a violation of the fiduciary duties owed to the defendants and, for reasons discussed infra, we remand for a determination of what an accounting would show to be the capital interests of the defendants as of February 11, 1971. There are no significant differences between this procedure and an accounting in equity and we reject the additional defendants' claim that Judge Owen erred in finding the partners liable for "conversion." Cf. *Sohon v. Rubin,* 282 App.Div. 691, 692, 122 N.Y.S.2d 439 (1st Dept. 1953) (trial court's finding of conversion against defendant partner was improper but plaintiffs awarded the amount an accounting would have shown them entitled to).

they would not issue the opinion letter.[24] Although Persky represented the Corporation at this time, he nevertheless acted as "special counsel" to the Partnership and issued an opinion letter which Judge Owen characterized as "worthless."

The record demonstrates that Persky, Kayne, Sloane, Risher and Muh were in close communication. At the same meeting that counsel for Gross, Bleich and Donoghue told Persky, Risher and Muh that the transfer could not be conducted without their consent, Gross was told that if he wanted to avoid being sued he should go along with the transfer and convince Bleich and Donoghue to do so. Gross refused to comply and shortly after this meeting concluded, Kayne and Sloane called Gross from California and renewed the threats. On January 23, Kayne met with Gross and again threatened him. Bleich testified that some time in January Risher threatened her with the Buckley claim in an attempt to coerce her consent. On February 3, 1971, the day after Persky had sent out the letter indicating that the transfer would be cancelled if Bleich did not consent, Kayne and Sloane brought suit in California. There was evidence that other threats were made as the closing date drew nearer but we think that the evidence we have summarized is sufficient to support Judge Owen's conclusion that Persky, Kayne, Risher, Muh and Sloane believed that the consent of Donoghue and Bleich was necessary to transfer and conspired to coerce the necessary acquiescence. When this plan failed they proceeded with the transfer, as promoters, officers, and counsel to the Corporation, in knowing violation of the rights of Donoghue and Bleich.

As to the liability of the partners, the Partnership had been informed by Burak that the transfer could not be conducted without the consent of Bleich and Donoghue; Burak specifically discussed the matter with Andrew Newburger and Persky. Thereafter, Persky sent out a letter to counsel stating that if Bleich did not consent, the transfer would be cancelled. On the date of the closing Rosenman, Colin refused to issue an opinion letter stating that the Partnership had the authority to make the transfer. Judge Owen specifically rejected the argument that the partners simply went along with the transfer based on the advice of other counsel present. In this regard, it is significant that the record is devoid of any testimony by any of the defendant partners that they believed in the correctness of Persky's opinion and disbelieved the advice of their own counsel and that, in its final form, the transfer agreement provided that the Corporation accepted liability for the claims of Gross, Bleich and Donoghue. Judge Owen concluded that "the partners consenting did so as a matter of business judgment having been forgiven substantial capital arrears and hoping that the transfer to the Corporation would save their deeply threatened interests . . . they were prepared to accept the letter Persky proposed and delivered and the risks of illegality which went with it as a deliberate business choice." We conclude that the findings of Judge Owen in this regard were not clearly erroneous.

A number of the additional defendants argue that even if the transfer violated section 98, judgment as to Gross on the first, second and fourth counterclaims must be reversed because he had no standing as a withdrawn general partner to complain of

24. Finley, Kumble argues that the opinion letter was immaterial because the condition of its issuance could have been waived by the Corporation and because Gross, Bleich and Donoghue did not rely on the letter. This argument simply misconceives the importance of the letter as one of the steps in the plot to gain control of the Partnership assets. Judge Owen found that the letter was an "essential document" to the closing and this finding is supported by the testimony of Robert D. Steefel, counsel to one of the limited partners; he testified that he and the other attorneys representing the limited partners stated at the closing that the transaction could not be completed without the opinion letter. Similarly, Muh testified that on the night of the closing Berkowitz told him "that we have to have an opinion letter." Thus, as a practical matter, it appears that the deal would not have gone through unless a letter of opinion was issued.

the violation. The additional defendants contend that section 98 protects only limited partners and that under the terms of the partnership agreement, the Partnership or its successor had the right to retain and use Gross' capital for a period of twelve months from the effective date of his withdrawal (until September 30, 1971). Gross contends that, even if this argument is correct, the finding of liability must be affirmed because the transfer and the events leading up to it constituted a breach of fiduciary duty, entitling him to a return of his capital interest in the Partnership. We agree.[25]

Essentially, the issue before Judge Owen was whether the misconduct on behalf of the partners was sufficient to entitle Gross to terminate his obligations under the partnership agreement and have his share of the transferred assets returned—that is, in effect, to have a decree of dissolution and an accounting effective February 11, 1971. See Partnership Law, §§ 62, 63; Crane and Bromberg, *Law of Partnership*, § 78(c) (1968); note 22, supra.

■ Although there is no set formulation of the fiduciary duties of partners, the main elements of the obligations owed by one partner to another have been defined as "utmost good faith, fairness, loyalty." Crane and Bromberg, supra, § 68, at 390. In *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928), Chief Judge Cardozo described the obligations of co-partners as follows:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by

fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

Id. at 464, 164 N.E. at 546 (citations omitted).

■ Further, although Gross withdrew from the Partnership, effective September 30, 1970, this did not terminate the fiduciary obligations of the partners to him; indeed, as a withdrawn general partner Gross no longer had any voice in management, although his capital remained in the firm at the risk of the business and Gross continued to share in an allocated portion of the firm's profits and losses. Thus, we conclude that at least up to and perhaps after the transfer, the Partnership and its members owed to Gross the duties of good faith, fairness and loyalty in their dealings with him regarding the Partnership business. See, e. g., Partnership Law, § 43(1); *R. C. Gluck & Co., Inc. v. Tankel*, 24 Misc.2d 841, 846, 199 N.Y.S.2d 12 (Sup.Ct.N.Y. County 1960), aff'd, 12 A.D.2d 339, 211 N.Y.S.2d 602 (1st Dept. 1961); *Boxill v. Boxill*, 201 Misc. 386, 391, 111 N.Y.S.2d 33 (Sup.Ct.N.Y. County

**25.** The parties have expended considerable effort disputing what Judge Owen actually found. The additional defendants contend that the award to Gross was based on a finding of conversion and not upon breach of fiduciary obligation. Although Judge Owen did not specify which allegations in defendants' first, second and fourth counterclaims he was relying on, the theory of breach of fiduciary obligation was clearly presented to him. Judge Owen laid out in detail the conspiracy by the promoters to grasp control of the Partnership assets and found that the partners had violated their fiduciary duties to Gross, Bleich and Donoghue by permitting the conspiracy to reach fruition and lending themselves to its goals.

See note 22, supra. Aside from this conclusion of law, we find that the facts as found by Judge Owen independently support a finding of breach of fiduciary obligation. Thus, even had Judge Owen not specifically found a breach of duty, Gross would not be barred from raising this claim on appeal. See, e. g., *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156, 25 L.Ed.2d 491 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court"); *Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.*, No. 75–7663, slip op. 4703, 4710 n. 3 (2d Cir. July 13, 1977).

1952); *Pearlstein v. Baff*, 60 N.Y.S.2d 713 (Sup.Ct.Queens County), rev'd on other grounds, 270 App.Div. 1043, 63 N.Y.S.2d 710, modified, 271 App.Div. 834, 65 N.Y.S.2d 851 (2d Dept. 1946), aff'd, 296 N.Y. 881, 72 N.E.2d 613 (1947).

Judge Owen found that the promoters threatened Gross with baseless litigation in order to force him to go along with the transfer. In making such threats Kayne, Sloane, Muh, Risher and Persky were acting in various capacities, such as agents of or counsel to the Partnership and promoters and future officers of the Corporation. On various occasions, members of the Partnership were either present while threats were made or were aware of such actions. Thus, at a meeting of the limited partners, general partners and subordinated lenders Persky circulated a copy of a complaint which falsely accused Gross of churning the Buckleys' account. See note 3, supra. The Partnership had cleared all of the Buckley transactions and, as Judge Owen found, had never raised any question as to their propriety; indeed, the director of compliance for the Partnership testified that after investigation he concluded that the churning claim was without merit and that he so informed Robert Stern, who agreed with him. The record indicates that members of the Partnership either knew or had reason to know that the Buckleys had never dealt with Gross, yet even after this error was pointed out, no effort was made to correct the false allegation. In this regard, Judge Owen found that Persky, who at this time was acting as counsel for the Partnership, "not only did not care about the facts, he obviously did not *want* to know about them." The record also shows that as early as September 3, 1970, Kayne had stated in the presence of Frank and Richard Stern (general partners) that he intended to get a withdrawal of Gross' resignation "nicely or otherwise"; at this time, Kayne, Persky and the Sterns drew up a list of "grievances" and "threats" to be used in negotiations with Gross. Similarly, Ned Frank another general partner, drew up a list of instances of alleged malfeasance by Gross. Gross was threatened with claims of mal-

feasance and six claims from the Frank list were asserted as counterclaims in this action; no proof was offered on four of these claims and the other two were dismissed by Judge Owen. See note 16, supra.

■ Although the use of threats and the assertion of these questionable claims against Gross may not constitute malicious prosecution, coercion or abuse of process, we find that they were inconsistent with the high standards of loyalty and fair dealing demanded of fiduciaries. Cf. *A. S. Rampell, Inc. v. Hyster Co., supra,* 3 N.Y.2d at 377, 165 N.Y.S.2d 475, 144 N.E.2d 371; *Duane Jones Co., Inc. v. Burke,* 306 N.Y. 172, 187–89, 117 N.E.2d 237 (1954). We find no merit to the argument that Gross cannot complain of this treatment because he was attempting to use Bleich and Donoghue in order to gain special advantage. Gross was under no obligation to go along with a transfer he felt was being conducted in bad faith. It is understandable that he would seek to protect his sister and his secretary (both of whom followed him into the Newburger investment) from what he perceived as a plot to grasp the Partnership assets; indeed, Gross' apprehension was borne out by the findings of the district court. Further, partners are not relieved of fiduciary duties by strained relations between them. Crane and Bromberg, supra, § 68 at 394.

■ The record indicates that as part of the February 11 transfer, the Corporation agreed that it would not seek to recover approximately twenty-five per cent of the outstanding capital arrears of certain general partners, which Judge Owen found amounted to one-half million dollars in debt forgiveness. Andrew Newburger deposed that the debt forgiveness was bargained for in negotiations with the promoters and that the general partners with deficit positions agreed that they "should get as much forgiveness as [they] could." Judge Owen found that the debt forgiveness, which was undertaken by several general partners and acquiesced in by the rest (Gross specifically objected to the forgiveness during negotia-

tions, however), was the *quid pro quo* for consent to the transfer. We find that it was also a form of self-dealing in violation of the fiduciary obligations owed to Gross, Bleich and Donoghue. See, e. g., *Meinhard v. Salmon*, supra, 249 N.Y. at 468, 164 N.E. 545; *Executive Hotel Associates v. Elm Hotel Corporation*, supra; *In re Kohn's Estate*, 26 Misc.2d 659, 663, 116 N.Y.S.2d 167 (Sur. Ct.N.Y. County 1952), aff'd, 282 App.Div. 1045, 126 N.Y.S.2d 897 (1st Dept. 1953).

In sum, although there are no New York cases precisely on point, we conclude that the partners in negotiating and conducting the transfer breached their fiduciary obligations to Gross and that the promoters and Persky, acting on behalf of the Partnership and the Corporation, induced and participated in this breach of duty; accordingly, we affirm Judge Owen's findings of liability on defendants' first, second and fourth counterclaims.

■ We also reject Finley, Kumble's argument that it cannot be held liable for the acts of the Partnership and the Corporation. Under New York law an attorney generally cannot be held liable to third parties for actions taken in furtherance of his role as counsel unless it is shown that he "did something either tortious in character or beyond the scope of his honorable employment." *Dallas v. Fassnacht*, 42 N.Y. S.2d 415, 418 (Sup.Ct.N.Y. County 1943). Thus, while an attorney is privileged to give honest advice, even if erroneous, and generally is not responsible for the motives of his clients, admission to the bar does not create a license to act maliciously, fraudulently, or knowingly to tread upon the legal rights of others. See *Steinberg v. Guild*, 22 App. Div.2d 775, 776, 254 N.Y.S.2d 4 (1st Dept. 1964), aff'd, 16 N.Y.2d 791, 262 N.Y.S.2d 715, 209 N.E.2d 887 (1965); *D. & C. Textile Corp. v. Rudin*, 41 Misc.2d 916, 918–19, 246 N.Y.S.2d 813 (Sup.Ct.N.Y. County 1964); *Kasen v. Morrell*, 18 Misc.2d 158, 162, 183 N.Y.S.2d 928 (Sup.Ct.Kings County 1959). The issue here is simply whether Judge Owen was warranted in finding that Persky had violated this standard.

■ Judge Owen found that "[w]ithout question, Persky was at the heart of this entire matter, guiding the entire plan, carrying threats to the dissidents and knowingly counseling, advising and instituting baseless and fraudulent lawsuits to achieve the [promoters'] goal." Judge Owen's findings indicate that, *inter alia*, Persky was responsible for: (1) manipulating the settlement and assertion of the Buckley claim in bad faith; (2) threatening the defendants with the Buckley claim and other claims in bad faith; (3) naming Gross in the complaint as the customer's man with whom the Bukleys dealt in disregard of ·the truth, thereby needlessly vilifying Gross; (4) issuing a false opinion letter as "special counsel" to the Partnership, thereby furthering the transfer in violation of the rights of Bleich and Donoghue; and (5) inducing and participating in the partners' breach of fiduciary obligation to Gross, Bleich and Donoghue. We find that the record supports the conclusion that Persky went "beyond the scope of his honorable employment" and the district court's finding of liability.

■ *Damages.* Finally, we turn to the subject of damages. In addition to awarding defendants what it found to be their capital interests, the court awarded Gross $50,000 in punitive damages. This was error.

In *Koufakis v. Carvel*, 425 F.2d 892 (2d Cir. 1970), we found that under New York law an award of punitive damages would not be proper where the wrong complained of was not " 'aimed at the public generally,' " id. at 908, quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961), and where the possibility of punitive damages was not necessary to induce suit to right a wrong that would otherwise go unpunished. See *Big Seven Music Corp. and Adam VIII, Ltd. v. Lennon*, 554 F.2d 504, 513 (2d Cir. 1977); *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976). Judge Owen did not find either of these factors present nor can we on this record. See *Vinlis Construction Co., Inc. v. Roreck*, 27 N.Y.2d 687, 689, 314 N.Y.S.2d 8, 262

N.E.2d 215 (1970). We can perceive no other basis for upholding this part of the judgment and, accordingly, the award of punitive damages must be reversed.

■ As the district court recognized, the sum of money to which the defendants were entitled was dependent upon what an accounting would show to be the capital interests of Gross, Bleich and Donoghue as of February 11, 1971. However, rather than ordering an accounting, the district court simply accepted the testimony of defendants' expert, Irving Lauterbach. Essentially, Lauterbach attacked the financial statement and schedule of partners' capital accounts prepared by Peat, Marwick, Mitchell & Co. on the ground that it inflated the Partnership's 1970 operating losses, thereby decreasing the amount of assets available for distribution. The district court apparently accepted each of Lauterbach's objections to specific losses attributed by Peat, Marwick to the 1970 financial year and adopted Lauterbach's calculation of the defendants' interests with these items removed from the Partnership's balance sheet.

The Corporation and the additional defendants contend that Lauterbach's testimony was inherently inconsistent and in conflict with Judge Owen's findings; further, some of the additional defendants renew their contention that a proper accounting would have shown that the defendants had little or no capital interest in the Partnership. Although we note that at least in one significant instance Judge Owen's findings are inconsistent with Lauterbach's calculations,[26] we find it impossible to evaluate the Corporation and additional defendants' claims without more specific findings from the district court. It was incumbent upon the district court to resolve this dispute, which involves interpretation of the partnership agreement and a determination of the propriety of a number of additions to the 1970 operating losses, by making specific findings capable of review in this court. See Fed.R.Civ.P. 52(a); *Rapisardi v. United Fruit Co.,* 441 F.2d 1308, 1312–13 (2d Cir. 1971); *Fuchstadt v. United States,* 434 F.2d 367, 369–70 (2d Cir. 1970). Further, we can find no support in the record for the district court's conclusion that the transfer destroyed the opportunity for an accounting. There is no evidence that any of the books or records of the Partnership necessary for an accounting were not available. Although we recognize the difficult position of the district court, which decided this case without the benefit of a transcript, we think the proper procedure here would have been for Judge Owen to make findings, in the nature of an accounting, indicating the assets and liabilities of the Partnership, the capital interest of each defendant, and how these figures were arrived at; accordingly, we remand for this purpose. We leave it to the discretion of the district court on remand as to whether this determination can be made on the present record or whether further proceedings will be advisable.[27]

## C. The Antitrust (Ninth) Counterclaim

In January 1971, Rafkind & Co., which was a competitor of the Partnership in the brokerage business in New York City, asked Gross to be a trader for the firm's own account. In accordance with NYSE Rule 345.18, which requires a thorough inquiry into the previous record and reputation of any prospective employee, Rakfind & Co. wrote to the Partnership requesting clear-

---

**26.** In determining the capital interests of Gross, Bleich and Donoghue, Judge Owen specifically relied on the fact that the Partnership's "financial picture" would have been strengthened had the $500,000 in debt forgiveness been collected; however, according to Lauterbach's calculations, which were relied on by Judge Owen, after certain adjustments were made to decrease the 1970 operating losses, there would have been little or no capital arrears to collect.

**27.** In calculating Gross' share of the Partnership assets, Lauterbach did not include as part of the Partnership assets the value of the warrants claimed by Gross in his third counterclaim. Since we reverse the judgment for Gross on the third counterclaim, we would have to remand in any event for a determination of whether the value of the warrants should be included in determining defendants' capital interests in the Partnership and what effect this would have on their recovery.

ance to employ Gross as a "registered representative." The Partnership responded by threatening to enforce the covenant in the partnership articles which barred Gross from working as a trader at another firm before January 1972. Rakfind & Co. then withdrew its offer to Gross. On these facts, the district court found no antitrust violation. We agree.

[26] In affirming the district court, we need not pass upon the general applicability of the federal antitrust laws to postemployment restraints. Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. See Blake, *Employee Agreements Not To Compete,* 73 Harv.L.Rev. 625, 627 (1960). Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.

In certain cases, postemployment restraints do serve legitimate business purposes: they prevent a departing employee from expropriating his employer's secrets and clientele. See Blake, supra at 651–74. Consequently, we have held that a per se ban on all such restrictive covenants would not be warranted. *Bradford v. New York Times Co.,* 501 F.2d 51, 60 (2d Cir. 1974). In *Bradford* we also expressed some concern over whether the federal antitrust laws should be brought to bear on employer-employee controversies which individually have only a small impact on commerce and which have traditionally been handled in state courts. See also *Capital Temporaries, Inc. of Hartford v. Olsten Corp.,* 506 F.2d 658, 666 (2d Cir. 1974). On the other hand, it has been argued that involvement of the federal courts is needed because widespread use of overbroad postemployment restrictions is causing serious anticompetitive harm to the national economy. See Goldschmid, *Antitrust's Neglected Stepchild: A Proposal for Dealing with Restric-*tive Covenants under Federal Law, 73 Colum.L.Rev. 1193, 1206–07 (1973).

[27] If section 1 of the Sherman Act were to be applied, two lines of inquiry seem relevant. First, there is the question of facial overbreadth: Will the restrictive covenant operate in circumstances where no valid business interest of the ex-employer is at stake? Restraints on postemployment competition that serve no legitimate purpose at the time they are adopted would be per se invalid. See generally *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Second, even if the clause is not overbroad per se, it might still be scrutinized for unreasonableness: Are the restrictions so burdensome that their anticompetitive purposes and effects outweigh their justifications? Restraints that fail this balancing test might be struck down under a rule of reason. See generally *Golden v. Kentile Floors, Inc.,* 512 F.2d 838, 844 (5th Cir. 1975); *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 281 (6th Cir. 1898), modified & aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *Lektro-Vend Corp. v. Vendo Co.,* 403 F.Supp. 527, 532–33 (N.D.Ill.1975), aff'd, 545 F.2d 1050 (7th Cir.), cert. granted, 429 U.S. 815, 97 S.Ct. 55, 50 L.Ed.2d 74 (1976).

[28] We find no support in the record for Gross' claim on either of these possible theories. A brokerage firm has a legitimate interest in curtailing a former partner's freedom to handle customer accounts at competing firms in order to prevent him from taking their customers with him. Gross contends the noncompetition clause in this case was overbroad because it also prohibited him from serving simply as a trader for another firm. However, the record does not indicate that anyone at the Partnership was informed that Gross would not be handling customer accounts at Rafkind & Co. Indeed, in its initial letter to the Partnership, Rafkind & Co. announced that Gross was to be employed as a "registered representative," which, as defined in NYSE Rule 10, means a broker who trades for customers' accounts and not solely for the firm account. Thus, Gross has not proved that

the Partnership knowingly enforced the arguably overbroad portion of the noncompetition clause. Nor did Gross show anticompetitive impact, industry practice, etc., such as might conceivably warrant a finding that the scope of the restriction enforced was unreasonable. Since Gross failed to prove the Partnership guilty of enforcing a restraint that was overbroad per se or otherwise unreasonable, he failed to make out a case under any possible interpretation of the Sherman Act.

Gross also contends the district court erred in dismissing for lack of jurisdiction, prior to trial, his claim that the restrictive covenant violated state law. However, since we affirm the dismissal of Gross' federal antitrust claim, no principles of judicial economy, convenience, or fairness would now be served by a remand for further proceedings on the related state law issues. Regardless whether pendent jurisdiction once existed over the state law claim, there is no longer any reason for that claim to be adjudicated in federal court. At this point, the claim can be dealt with more appropriately by a state court. See *United Mine Workers v. Gibbs, supra,* 383 U.S. at 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); note 20, supra.

In summary, we affirm the dismissal of the Corporation's churning claim, the six counterclaims against Gross, and defendant's fifth, sixth, seventh, eighth and ninth counterclaims. We also affirm the district court's finding of liability on defendants' first, second and fourth counterclaims but reverse the award of punitive damages and remand for recomputation of damages. We reverse the judgment on defendant's third counterclaim and remand with instructions to dismiss this claim.